UNITED STATES of America, Appellee,

v.

James E. JOHNSON, Appellant.

No. 79–5109.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 7, 1979.

Decided April 11, 1980.

William C. Morris, Jr., Asheville, N. C. (Morris, Golding, Blue & Phillips, Asheville, N. C., on brief), for appellant.

S. Lee Atkins, Asst. U. S. Atty., Asheville, N. C. (Harold M. Edwards, U. S. Atty., Asheville, N. C., on brief), for appellee.

Before RUSSELL, PHILLIPS and SPROUSE, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The defendant/appellant was charged with the crime of obstructing correspondence deposited in the mails and of prying into the secrets of another under § 1702, 18 U.S.C. At the conclusion of the testimony the District Judge instructed the jury that the charge under Section 1702 included the lesser offense of knowingly obstructing and retarding the passage of the mails under § 1701, 18 U.S.C. He accordingly in his jury instructions proceeded to state separately the essential elements of an offense under the two sections. The jury acquitted the defendant of the charge under Section 1702 but convicted him of a violation of Section 1701. The defendant has appealed that conviction. We affirm.

The evidence is largely undisputed. The defendant was the Superintendent of the McDowell County (North Carolina) Schools, elected as such by the Board of Education. An election of at least one member of the Board of Education was imminent at the time and Scotty Willis was a candidate for election to that Board. On October 20, 1978, Joe Morgan mailed a postcard addressed to "Mr. Scotty Willis, Candidate/McDowell County Bd. of Education, R.__?, Marion, N. Carolina." Morgan wrote that he was "surprised that your Supt. had only an A.B." and expressed the "hope you

can be elected to change that." That card was delivered to the office of the McDowell County Board of Education at about three o'clock in the afternoon on either the 24th or 25th. Mrs. Young, a receptionist in the office, received the mail delivery which included the postcard addressed to Willis and, after receipt, she took the card to the secretary to the Superintendent, who instructed her to give the card to the defendant. The defendant read the card, explained to the two ladies working in the office that the card referred to him and expressed considerable concern about its contents. He returned to his private office and brooded over the card, going over it, as he testified, "for quite some period of time." He then determined to make photocopies of the card on the photocopying machine in his office. The number of photocopies made by him is not clear, but at least two were made. He put the card itself in his desk in his private office and, after telephoning his brother, took a photocopy of the card over to the brother's office in the late afternoon of that same day. He explained his visit to his brother by saying that Willis had "worked for my brother at one time, and I felt like my brother might make him a little bit more agreeable toward my position."

The defendant's brother took the photocopy of the postcard from the defendant and drove in his truck to the home of Willis. He called Willis out to his truck. After showing Willis the photocopy, he expressed in some anger his shock that Willis would have made such a statement about his brother and demanded to know whether Willis had made the statement.[1] Willis replied that he did not recall making such a statement, but pressed the brother to tell him from whom he had gotten a card mailed to him, but which he had not yet received.

After his unpleasant confrontation with the brother, Willis went later that night to the defendant's home in what the defendant described as a "quite distraught, disturbed" frame of mind and demanded to know what the defendant knew about the card or photocopy shown him by the defendant's brother. The defendant testified that he told Willis he knew nothing about either the card or the photocopy. However, Willis testified that the defendant told him that he (the defendant) first heard of the postcard when his brother had "brought it to his attention" that afternoon. As the discussion ended, Willis told the defendant he intended to take the matter up with the Post Office Department. This statement frightened the defendant and, in his own words, he "decided it was time to get the thing back the next morning fast." Sometime the next day he did retrieve the postcard from his desk and either returned it personally to the Post Office or had the office messenger do so. There is some conflict in the record about how and when the postcard was returned to the Post Office. The defendant testified that Gibson, the messenger in the office, was given the postcard about 7:30 o'clock or earlier the next morning for delivery to the Post Office. However, an employee in the office of the defendant testified that the defendant told her that it was not until that afternoon that the postcard was returned to the Post Office and that the defendant, not the messenger, returned it. In any event—irrespective of which version is correct—Willis never received the card in his mail box until the next afternoon, October 26th.

Anticipating the postal investigation, the defendant called the employee who had given him the card and told her, according to his own version, that she "didn't have to say anything" to the postal inspector about the postcard incident. When he was later interviewed by the postal inspector the defendant denied making any photocopies of the postcard and asserted that when the card was brought to him, he placed it "back in the mail stream." The defendant's brother, when examined before the grand jury, testified that he knew nothing about the card or photocopy and had never seen either. Later, when the Government dem-

---

1. The postcard did not indicate that Willis had made the statement about the defendant contained therein, but the brother assumed that Willis had.

onstrated conclusive evidence to the contrary, the brother returned to the grand jury and admitted that he had known of the event and his part in it.

■ It is the defendant's position that these facts are insufficient to support a conviction under Section 1701, since there was no knowing obstruction or delay in the delivery of the postcard to its addressee. This argument founders on the well-settled law that the protection of mailed material from obstruction and delay does not end when the material passes legitimately out of the control of the United States Postal Service, but extends until the mailed material is physically delivered to the person to whom it is directed or to his authorized agent. That is the proper construction of the term "the passage of the mail" in Section 1701. *United States v. Lavin* (3d Cir. 1977) 567 F.2d 579, 581; *United States v. Fleming* (10th Cir. 1973) 479 F.2d 56, 57; for a similar construction under Section 1702, see *United States v. Brusseau* (4th Cir. 1977) 569 F.2d 208, 209; *United States v. Murry* (8th Cir. 1978) 588 F.2d 641, 644; *United States v. Ashford* (8th Cir. 1976) 530 F.2d 792, 795; *United States v. Murray* (D.Md.1964) 306 F.Supp. 833, 834–45.[2] Accordingly, in *United States v. Murry*, a letter properly addressed to *A* was delivered to his former home; when received, the letter was removed from the mail box at his former home and placed on a bookcase in the house where incoming mail was generally put. The defendant picked the letter up and abstracted from it a credit card. The defendant defended against a prosecution under Section 1702 because, as he said, the letter at the time he took it was no longer in "the passage of the mail." The Court dismissed the claim and sustained the conviction. Again in *United States v. Lavin, supra,* at 581, the letter in question, though addressed to another, was delivered by the postman by mistakenly putting it under the door of the defendant's apartment. The defendant retained the letter including a check payable to the addressee. The defendant, among other things, was convicted under Section 1701, the Court finding that "the passage of the mail" did not end until the letter was actually received by the addressee himself.

■ These cases conclusively establish that, when the postcard in this case was received by the defendant, it was still within the protection of Section 1701 and the defendant had no right to intentionally or deliberately obstruct or delay its delivery, however slight, to the correct addressee. There can be no argument that the defendant did obstruct the "passage" by failing on the afternoon he received the postcard to return it to the Post Office and by retaining it in a desk drawer in his private desk. Nor was his retention of the postcard inadvertent or merely negligent. The defendant in effect admitted that he brooded over the postcard and debated what he should do with it. He certainly evidenced no disposition to return it "promptly" to the Post Office. He put it in his desk, an act which certainly suggests he intended to keep it for some time at least. Moreover, it is inferable that he was not prompted to return the card to the postal service until he was frightened by Willis' threat that he (Willis) was going to the Post Office authorities. There can be little doubt that he felt that his action had been unlawful, for he called Mrs. Young, using language that could only justify the inference that he was endeavoring to induce her to cover up for him. He magnified this attempt at "cover-up" by denying, as he himself admits, both to the postal inspector and to Willis any knowledge of the postcard. There was accordingly sufficient evidence of such knowing and intentional delay and obstruction that the defendant's guilt under Section 1701 was properly one for the jury.

For the foregoing reasons the judgment of the district court is

*AFFIRMED.*

---

**2.** In construing § 1708 a distinction has been drawn between improperly addressed and misdelivered mail in some cases, see *United States v. Lavin,* 567 F.2d at 581, n. 6, but that distinction, if applicable in a Section 1701 case, is inapplicable here. The postcard was correctly addressed; the postal authorities simply misdelivered it to the Board of Education's office.