**UNITED STATES of America, Plaintiff,**

v.

**Alexander R. ALMENDRAL, Defendant.**

**No. 4–96–0413–WDB.**

United States District Court,
N.D. California.

April 1, 1997.

Dana Hayter, U.S. Dept. of Justice, San Francisco, CA, for Plaintiff.

Joyce Levitt, U.S. Federal Public Defenders, San Francisco, CA, for Defendant.

### OPINION AND ORDER ENTERING JUDGMENT OF ACQUITTAL

BRAZIL, United States Magistrate Judge.

### PROCEDURAL BACKGROUND

In this case the government elected to charge defendant Alexander R. Almendral, in a one count misdemeanor Information filed September 30, 1996, with violating Section 1701 of Title 18, United States Code. That Section reads as follows:

Whoever knowingly and willfully obstructs or retards the passage of the mail, or any carrier or conveyance carrying the mail, shall be fined under this title or imprisoned not more than six months, or both.

The case was tried to the court on March 24th and 25th, 1997. When the government rested, after having called eleven witnesses, defendant moved for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. That Rule commands the court to enter the requested judgment "after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Thus the court is required to enter the judgment of acquittal if the evidence presented by the government is not sufficient to sustain a conviction of Mr. Almendral under 18 U.S.C. § 1701. For the reasons set forth below, the court concludes that the evidence presented by the government is not sufficient to convict Mr. Almendral under this statute.

### EVIDENTIARY SETTING

During the trial of this matter the government introduced substantial evidence in support of the following facts. On April 26, 1996, a Postal Service letter carrier named Venson Laxa was unable to deliver a certified letter that was addressed to Leonard Curcuruto, who, like defendant, is a Postal Service employee who works out of the Antioch Post Office. Mr. Laxa could not deliver the certified letter because no one was home at Mr. Curcuruto's residence when the delivery was attempted. The letter was from the Postal Service's EEO unit. Mr. Laxa left a notice of attempted delivery at Mr. Curcuruto's residence, but he took the letter itself back to the Antioch Post Office, where he gave custody of it, still sealed, to Juan Murillo in the "Registry Cage." Mr. Murillo kept the letter in that Cage until about 6:30 p.m., when he deposited it, still sealed, in one of the open slots of the "Notice Left Certified Case." Up to this point, appropriate Postal Service procedures had been followed and the letter was being processed in the normal course or flow dictated by those procedures.

When Mr. Curcuruto returned to his house late in the afternoon of the 26th he found the notice of attempted delivery. Later that evening, after dinner, he went to the Antioch Post Office to pick up the letter. When he arrived, sometime between 7:30 p.m. and 8:15 p.m., the clerk who responded to the will call buzzer, Dan Diaz, let him in and the two men walked over to the "Notice Left Certified Case," where Mr. Diaz located the letter and discovered that the tape by which it had been sealed had been cut. Thus the evidence showed that the seal on the letter to Mr. Curcuruto had been broken sometime between 6:30 p.m. and 8:15 p.m.

The government introduced substantial evidence that it was Mr. Almendral who broke the seal of the letter and looked at its contents. Most notably, the government introduced a statement that Mr. Almendral wrote (in his own handwriting) and signed, after a long interview by a Postal Inspector, in which Mr. Almendral stated: "It was a moment of weakness on my part that curiosity got me to open and look at Lenny's letter from EEO. I'm sorry for the trouble I've caused." (Gov.'s Ex. 12.) The government also produced three witnesses who, a few minutes later, heard Mr. Almendral confess in substantially the same terms over the phone to his Postmaster. In addition, the government introduced testimony by Dan Diaz that Mr. Almendral had been his supervisor that night, had worked in close proximity to the "Notice Left Certified Case," and had remained in the Antioch Post Office until at least 7:00 p.m.

Most significant for purposes of ruling on the defendant's motion, however, is the fact that the government failed, clearly, to introduce evidence that would be sufficient to support a finding, beyond a reasonable doubt (or even by a preponderance of the evidence), either (1) that Mr. Almendral intended, when he broke the seal of the letter and looked at it, to obstruct or retard the passage of the mail, or (2) that, in opening the letter and

looking at it, he in fact obstructed its progress through the postal system or retarded its delivery.

There is no evidentiary basis for an inference that the letter would have reached Mr. Curcuruto any earlier if Mr. Almendral had not opened it. And while it is possible that Mr. Almendral took the letter to some other location within the Antioch Post Office to open and examine it, there is no evidence that he did. Under the evidence, it is comparably likely that he actually had the letter in his hands for no more than a minute or so and looked at it right in front of the "Notice Left Certified Case" (which the government pointed out several times is blocked from view from other parts of the office)

## LEGAL ANALYSIS

At first blush, it would appear that the absence of evidence that Mr. Almendral intended, when he opened the letter, to obstruct or retard the mail would be fatal to the government's case under section 1701. After all, that statute, by its terms, requires proof that the person charged "knowingly and willfully" obstructed or retarded the passage of the mail. As the seminal opinion from the Supreme Court about this statute declared, this law applies "to those who know that the acts performed will have [the] effect [of obstructing or retarding the passage of the mail], and perform them with the intention that such shall be their operation." *United States v. Kirby*, 7 Wall. (74 U.S.) 482, 484–86, 19 L.Ed. 278 (1868). In its next sentence, however, the *Kirby* court proceeded to announce that "[w]hen the acts which create the obstruction are in themselves unlawful, the intention to obstruct will be imputed to their author, although the attainment of other ends may have been his primary object." *Id.*[1] Because it appears that at least two other statutes would make Mr. Almendral's opening of the letter in these circumstances unlawful (18 U.S.C.

---

1. Taken literally, this rule could lead to curious results in some circumstances. For example, if a postal service carrier made an illegal left turn while delivering her mail, solely for the purpose of getting the mail delivered sooner than it otherwise would be, but she was stopped by a police officer and cited, and if the process of being cited ended up delaying the delivery of the mail, the *Kirby* rule would require the courts to impute to the carrier "the intention to obstruct" the passage of the mail.

§ 1702 and 18 U.S.C. § 1703), the government's failure to prove that he intended to obstruct or retard the passage of the mail is not fatal to the prosecution under this statute. For reasons explained below, however, I have concluded that the government's failure to prove that Mr. Almendral in fact had the specific intent to obstruct or retard the passage of the mail is material to disposition of the defendant's motion under Rule 29.

We turn now to consider the legal significance of the government's failure to prove that by opening and looking at the letter Mr. Almendral delayed or in any other way impeded or interfered with its delivery to Mr. Curcuruto (the addressee). This failure of proof is most obviously relevant to the essential element of the offense that section 1701 articulates through the words "obstructs or retards the passage of the mail."

We begin with the notion that words used in criminal statutes should have some meaning. Legislators, lawyers and judges are in the word business—and they should be careful to use words with precision and to insist that words have real definitional substance. In particular, courts, when construing statutes, should be hesitant to distort words that are commonly used and that in that common usage have relatively clear definitions. "Obstructs" and "retards" are such words—and what the dictionary says they mean should not be wholly irrelevant to our task. According to Webster's II New Riverside University Dictionary 812 (1984), the word "obstruct" means: "(1) To clog or block (a passage) with obstacles. (2) To impede, retard, or interfere with (obstruct legislation). (3) To cut off from sight." That same source offers the following definition of the word "retard": "To slow the progress of: Delay." Id. at 1003.

How elastic did Congress intend these terms to be? Would it be consistent with congressional intent to conclude that the fact that the act on which the prosecution is based was itself unlawful is sufficient to satisfy *both* of the critical elements of this crime: (1) the specific intent element and (2) the obstruction or retardation element? Or would it be more consistent with congressional intent, as reflected in this and closely related statutes, to conclude that the phrase "obstructs or retards" has real meaning—the meaning commonly given to it—and cannot be satisfied through a second application of the same legal fiction the courts have used to satisfy the other core requirement of this statute, i.e., the specific intent requirement?

At some point, of course, the relentless use of legal fictions to satisfy core requirements of a criminal statute could raise serious constitutional problems—not the least of which is the requirement that a law give the persons who are governed by it meaningful notice about what kind of conduct will constitute a violation. Thus, as a general proposition, courts should be reluctant to overuse legal fictions in statutory construction—and that reluctance should be intensified when the government attempts to double dip into the legal fiction barrel for the purpose of extending the reach of a single apparently straightforward statute.

Excessive resort to legal fiction also implicates the relationship between the legislative branch and the judicial branch of our government. Simply stated, courts could use legal fictions to re-write legislation. In the case at bar, for example, if we were to use the same legal fiction to satisfy both key elements of the statute, we would essentially re-write the law so that what it prohibited was not just intentionally obstructing or retarding the passage of the mail, but any unlawful act committed in connection with any aspect of the movement of the mail. We should proceed cautiously before concluding that Congress really intended to write such a far reaching statute but choose not to say so—and instead chose to achieve this ambitious goal by using the words "obstructs or retards"—words which on their face relate to the *effects* of conduct on the passage of mail, not simply to whether conduct that was somehow connected to movement of the mail was lawful or unlawful.

With these general concerns in mind, we turn to the case law, which, according to the government, compels the conclusion that "any unauthorized halting *or diversion* of the stream [of handling mail] constitutes obstruction." (United States' Opposition to Defendant's Motion for Judgment of Acquittal, filed March 26, 1997, at 2 (emphasis in origi-

nal).) Our review of the authorities has yielded several relevant points. First (in chronology, not in analytical significance), we observe that courts first suggested that a legal fiction would be used to satisfy the specific intent requirement in cases where the government was trying to prosecute someone on the basis of an act that was otherwise lawful and that had some clearly legitimate purpose but that had a collateral and *unintended* effect of delaying the delivery of mail. *See Kirby,* 7 Wall (74 U.S.) at 487; *see also Lustiger v. United States,* 386 F.2d 132, 139 (9th Cir.1967). In these cases the judges' objective was to insulate the otherwise lawful actors (who happened to be law enforcement officials) from prosecution under this statute. So the first uses of the legal fiction arose in cases where the courts' objective was to restrict the reach of the statute, not to extend it—and where the *intent* that really drove the defendant's conduct was not to delay or impede delivery of the mail, but to accomplish some other (and lawful) purpose.[2]

Second, we note that, with one arguable exception,[3] no reported opinion has reached the conclusion that section 1701 can be violated when there has been no delay at all in the delivery of the mail. While the courts have not insisted that the delay be substantial, they have insisted that it at least be "measurable." *United States v. Upshaw,* 895 F.2d 109, 111 (3rd Cir.1990); *see also, United States v. Johnson,* 620 F.2d 413, 415 (4th Cir.1980).

Third, the courts have been least demanding about the showing of delay that will be deemed sufficient to satisfy the "obstructs or retards" requirement in cases where it is clear that the acts by the defendant on which the prosecution is based were accompanied in fact by specific intent to delay or interfere with the delivery of the mail. *Johnson,* 620 F.2d at 415. The case on which the government seems to rely most is just such a case. In *United States v. Austin,* 492 F.Supp. 502, 504 (N.D.Ill.1980), it appears that the critical predicate for the district court's conclusion that even very minor delays in the delivery of mail could offend section 1701 was the presence of actual willfulness in the defendant. Thus, the Austin court declared that it believed "that any obstruction of the mails, no matter how minor, *if done wilfully and with improper motives,* can constitute retardation, and therefore be a violation of 18 U.S.C. § 1701." *Id.* (emphasis added).

It is at this juncture that the government's failure to prove that Mr. Almendral intended to obstruct or retard the mail, or in any way to disrupt or interfere with its delivery to Mr. Curcuruto, returns, in a critical role, to the analytical stage. If the government had proved that Mr. Almendral in fact intended his act of opening and looking at this letter to delay or disrupt the flow of the mail to its addressee, then it might be appropriate, in the spirit of *Austin,* to uphold a conviction under section 1701 with little proof that the acts by the defendant actually slowed or interfered with the delivery of the mail. In such a setting, it might be appropriate to hold, in the government's words, that "any ... diversion of the stream constitutes obstruction." (United States' Opposition to Defendant's Motion for Judgment of Acquittal, filed March 26, 1997, at 2.) Not insisting on

---

2. It is not insignificant that when the *Kirby* court used the legal fiction to assume satisfaction of the specific intent requirement the Justices clearly assumed that real obstruction of the mail had occurred. In that case the defendants, local law enforcement officers acting pursuant to a warrant, had arrested the mail carrier on murder charges and held him for presentation to a local court. Clearly, on these facts, there was actual "obstruction" of the mail. And in the sentence in which it announced the imputation rule the high Court obviously assumed that a real "obstruction" would have resulted from the hypothetical unlawful act from which the defendants' conduct in *Kirby* was being distinguished.

3. The one arguable exception is *United States v. Austin,* 492 F.Supp. 502 (N.D.Ill.1980), which is discussed in the text. It is not clear, however, that even the *Austin* court would uphold a conviction when there was no proof of any delay at all. While the author of that opinion (District Judge Bua) made it clear that he did not believe that "the duration of the delay" was relevant (when the obstruction was in fact wilful), he appeared to assume that some delay, even though very minor, would have to be proved. *Id.* at 504 (explaining that "any obstruction of the mails, no matter how minor, if done wilfully and with improper motives, can constitute retardation" in violation of section 1701).

much of a showing of actual delay in that setting would promote the presumed underlying legislative objective, i.e., to deter and punish those who would "knowingly and wilfully" obstruct or retard the mail. Moreover, in that setting, at least the courts would not be using legal fictions to satisfy *both* of the critical elements of the statute. At worst, a legal fiction (in the form of presuming delay) would be used to satisfy one element of the statute.

But when the government fails to prove that the acts on which the prosecution is based were accompanied by an intent to delay or otherwise interfere with the passage of the mail, the courts should require the government to prove that the defendant's acts caused at least some measurable, even if not substantial, delay in delivery. To hold otherwise would permit courts (and prosecutors) to twice use legal fictions to satisfy both of the critical elements of the statute—and in so doing to distort the meaning of its key terms far beyond common usage and to extend the statute's reach to situations that Congress could not have intended.

A variation on the hypothetical described in footnote one, above, illustrates some of the difficulty that could ensue if such an approach were adopted. Assume that the postal service carrier who made the illegal left turn in order to expedite delivery of her mail was stopped and cited, but that the interaction with the police officer took no more than five minutes and ended up causing no delay at all in the delivery of the carrier's mail (e.g., because she had hustled harder than is expected or required over all of her route that day). A rule that permitted both of the critical elements of section 1701 to be satisfied by the single fact that the carrier had committed an illegal act in connection with the delivery of her mail would require a court to sustain a conviction under that statute on these facts—even though in the real world the carrier's actual intention (when she made the illegal left turn) was to speed the delivery of the mail and even though her illegal act did not delay the delivery of the mail one iota. Manifestly, Congress could not have intended to make this conduct a separate crime under section 1701.

■ To avoid violence to congressional intent, while preserving the government's capacity to deter and punish the kind of conduct at which section 1701 is centrally aimed, courts should insist on proof of some measurable delay (even if not substantial) in the delivery of the mail in cases where the evidence does not support a finding of actual intent to obstruct or retard, that is, in cases where that critical element of the statute is satisfied only by resort to legal fiction (only by imputing the requisite specific intent from the fact that the act on which the prosecution is based was itself unlawful). In contrast, in cases where the government proves that the defendant's actions were in fact accompanied by the specific intent to obstruct or retard the mail, it might be appropriate for courts to sustain a conviction on proof of "any unauthorized halting *or diversion* of the stream"[4] (meaning the path that the mail would follow under established postal service procedures)—without insisting on clear proof of actual delay in delivery.

This approach to construing section 1701 is consistent with the case law and with what we infer, from the explicit specific intent requirement in the statute, Congress' principal purpose was: to deter people from intentionally interfering with the flow of the mails. Under this approach, prosecutors could convict defendants who "knowingly and willfully" set out to delay or obstruct the passage of the mail, or to commit acts that obviously would have that effect, even when it is not clear how well those defendants succeeded. At the same time, this construction of section 1701 avoids endorsing its application to situations Congress is quite unlikely to have contemplated and avoids compounding distortions of the key phrases in the statute—distortions that would be quite severe if convictions were sustained when there was proof neither of intent to obstruct or retard nor of delay.

---

4. United States' Opposition to Defendant's Motion for Judgment of Acquittal, filed March 26, 1997, at 2 (emphasis in original).

■ We also emphasize that this approach to construing section 1701 does not disable the government from prosecuting defendants who open mail without authorization. As noted above, there are two other statutes under which Mr. Almendral could have been prosecuted: 18 U.S.C. § 1702 and 18 U.S.C. § 1703. A postal service employee who, without authorization, opens mail to which he had access in his official capacity apparently violates both of these statutes—simply by opening the mail, regardless of whether that act has any effect on the normal postal "stream." The fact that Congress self-consciously included the word "opens" among the kinds of acts that are punishable under these two statutes that are so proximate to section 1701, but did not use that word in section 1701, further supports our inference that Congress did not intend section 1701 to serve as the vehicle for prosecuting a postal employee whose unlawful act is limited to opening a letter—but who had no intention of obstructing or retarding the mail and who caused no delay in its delivery.[5]

## CONCLUSION

For all the reasons set forth above, the court holds that, by failing to prove either that Mr. Almendral intended to obstruct or delay the passage of the mail or that his conduct caused any delay at all in the delivery of the letter to Mr. Curcuruto, the government failed to prove that Mr. Almendral's alleged conduct violated 18 U.S.C. § 1701. Because that is the only statute under which he was charged and tried, the court is constrained by Federal Rule of Criminal Procedure 29 to GRANT Mr. Almendral's motion and to ORDER entry of JUDGMENT OF ACQUITTAL. IT IS SO ORDERED AND ADJUDGED.

---

5. 18 U.S.C. § 1702 also makes it a crime to take a letter out of a mail depository for the purpose of "pry[ing] into the business or secrets of another," regardless of intent to obstruct or retard the passage of mail and regardless of whether the act causes any delay in delivery.