# United States Court of Appeals
## For the First Circuit

No. 12-2441

UNITED STATES OF AMERICA,

Appellee,

v.

STEVEN G. MARSHALL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Howard, Circuit Judge,
Souter,[*] Associate Justice,
and Stahl, Circuit Judge.

Todd C. Pomerleau, with whom Chase A. Marshall and Pomerleau Wood LLP were on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

June 4, 2014

[*]Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SOUTER, Associate Justice.** Steven Marshall appeals his conviction for knowingly and willfully obstructing the passage of mails under 18 U.S.C. § 1701. He challenges the court's definition of the term "willfully," claims that evidence of willful obstruction was insufficient, and argues that scheduling irregularities violated due process. We affirm.

**I.**

Marshall had 26 years of experience with the United States Postal Service as a letter carrier, and in the fall of 2009 he was employed at the Greenfield, Massachusetts Postal Service Annex. Prior to setting out on his route each day, Marshall had to "case" his mail, sorting it by address and placing it in sequence for delivery. Postal workers are instructed to discard items that are addressed to a house or apartment known to be vacant as "undeliverable," and mail carriers are responsible for keeping a list of known vacancies on their routes in an "edit book" at their work stations, to be updated monthly. Commercial items discarded as undeliverable are placed in a bin marked "undeliverable bulk business mail," where they are checked by a supervisor and, if indeed undeliverable, recycled.

Mailings routinely handled on Marshall's route included "Town Criers," local newspapers featuring advertisements, which post office customers pay to have delivered, although the newspapers typically identify the subscriber simply as "Current

-2-

Resident" or "Postal Customer." In October 2009, after being informed that Marshall was discarding an "excessive" number of Town Criers, James Lengieza, Marshall's supervisor, told Marshall to "make sure that all the good Town Criers were being delivered." Over the next two weeks, Lengieza noticed a dramatic reduction in the number of Town Criers Marshall left in the discard bin.

In February 2010, Special Agent Kenneth Velazquez of the Postal Service Office of Inspector General was assigned to investigate Marshall's performance and began video surveillance of Marshall casing his mail, focusing on days the Town Criers were to be delivered. On February 26, Velazquez saw Marshall alternately casing Town Criers for delivery and discarding them into his bin, at times at a one-to-one ratio. After Marshall left on his route, Velazquez and Lengieza checked the bin, which contained 208 discarded Town Criers, to see how many were deliverable.

Velazquez monitored Marshall by video again on March 4 and March 18 and saw that sometimes Marshall checked the address while sorting the newspapers, but sometimes appeared to discard them without looking. Lengieza and Velazquez found that Marshall discarded 183 Town Criers on March 4 and 168 on March 18, and by checking the discarded mail against the edit book at Marshall's work station Lengieza determined that 80 to 90 percent of the Town Criers tossed out on March 4 should have been delivered.

On March 11, the interim postmaster, Joan Bates, went with Marshall on a "walk with," traveling the carrier's route to confirm the number of vacancies and assess how long it takes for the carrier to complete the route. During that excursion Marshall delivered more of the Town Criers than he did on either March 4 or March 18.

On May 27, Velazquez and fellow Special Agents Allison Glassick and Gerard Fernandez interviewed Marshall, who orally and in writing admitted his practice of discarding the Town Criers. Marshall explained that he had treated some of the copies as undeliverable because the locations addressed were vacant or because residents had asked him not to deliver them, and he acknowledged that he delivered more Town Criers on the "walk with" than usual, but "only to get a street time that was more acceptable for the route." He remarked that delivering the Town Criers was "a waste of energy" and although he insisted that he was not aware that discarding the volume of Town Criers was problematic, he also admitted that, "I'm not saying there's any excuse for [the non-delivery]." He promised that henceforth he would "deliver any and all Town Criers to vacant apartments and multiapartment deliveries."

Marshall was charged with obstructing the mails in violation of 18 U.S.C. § 1701, and the magistrate judge set a bench trial date of October 14. Because no scheduling order was issued,

-4-

the parties communicated informally with the clerk and with each other about discovery deadlines. Although the Government notified Marshall prior to trial that it planned to proceed with only two witnesses, Lengieza and Special Agent Glassick, it was only on the morning set for trial that Marshall filed four motions in limine: to exclude anonymous complaints, to exclude testimonial hearsay, to exclude photocopied Town Criers, and to exclude video of the surveillance and related testimony. To give the government a chance to respond, the magistrate judge rescheduled the trial for October 18, and following further motions for continuance, some by the Government and at least one by Marshall, she scheduled a final trial date of March 8, 2011. The judge granted Marshall's motions to exclude the anonymous complaints and hearsay, but admitted original evidence of the Town Criers and video surveillance.

On March 8, 2011, the bench trial began before the magistrate judge, at which the Government called not only Lengieza and Glassick but also (with three days' notice to Marshall) Velazquez as a witness to authenticate the video surveillance evidence. The judge found Marshall guilty of obstructing the mails under 18 U.S.C. § 1701 and sentenced him to pay a fine of $1,500, as well as a $25 processing fee and $10 special assessment fee. On November 9, 2012, the District Court for the District of Massachusetts affirmed the conviction.

**II.**

We review factual findings for clear error and legal questions, including statutory interpretation and sufficiency of the evidence, de novo. United States v. McFarland, 445 F.3d 29, 31 (1st Cir. 2006). On a sufficiency challenge, we take the evidence in the light most favorable to the verdict and reverse only where "no rational factfinder could have concluded that the evidence presented at trial, together with all reasonable inferences, established each element of the crime beyond a reasonable doubt." United States v. Symonevich, 688 F.3d 12, 23 (1st Cir. 2012).

The statute provides that "[w]hoever knowingly and willfully obstructs or retards the passage of the mail . . . shall be fined under this title or imprisoned not more than six months, or both." 18 U.S.C. § 1701. Marshall says first that the magistrate judge and the district court applied the wrong definition of "willfulness" in convicting him under 18 U.S.C. § 1701. The court followed the Second Circuit in United States v. Wooden in taking the position that showing willful action requires proof only that a defendant had an "illegitimate or improper intent" to obstruct deliverance of the mail. 61 F.3d 3, 5 (2d Cir. 1995). Marshall, in contrast, suggests that "willfulness" is shown only when a defendant knew his conduct was unlawful at the time he engaged in it.

The statutory term "willfully" is a chameleon, what the Supreme Court has called "a word of many meanings whose construction is often dependent on the context in which it appears." Bryan v. United States, 524 U.S. 184, 191 (1998) (quoting Spies v. United States, 317 U.S. 492, 497 (1943)) (internal quotation marks omitted); see also United States v. Ladish Malting Co., 135 F.3d 484, 487 (7th Cir. 1998) ("'Willfully' is . . . notoriously slippery . . . ."). Although this Circuit has never explained willfulness under § 1701, the Supreme Court took up an early version of the statute in United States v. Kirby and read the phrase "'knowingly and wilfully' obstruct or retard the passage of the mail" as applying to "those who know that the acts performed will have that effect, and perform them with the intention that such shall be their operation." 74 U.S. 482, 485-86 (1868). While Kirby, to be sure, has an ancient ring to it, its precedential force is buttressed by the general rule that reenactment of a statute carries congressional approval of phrases with prior judicial construction. See Keene Corp. v. United States, 508 U.S. 200, 212 (1993) ("Since . . . these cases represented settled law when Congress reenacted the [statutory language], we apply the presumption that Congress was aware of these earlier judicial interpretations and, in effect, adopted them."). And Kirby's interpretation has been echoed by other federal courts applying 18 U.S.C. § 1701 in more recent decades, which have read the term

"willfully" to require some level of intent greater than "inadverten[ce] or mere[] negligen[ce]." <u>United States</u> v. <u>Johnson</u>, 620 F.2d 413, 415 (4th Cir. 1980); <u>see also</u> <u>Wooden</u>, 61 F.3d at 5 (finding that "an inadvertent or negligent delay of the mail does not violate [§ 1701]").

Marshall, to be sure, does not argue that the willfulness requirement of § 1701 requires proof that a defendant was aware of the specific provision violated, as has been held with respect to some statutes in the criminal code. <u>See, e.g.</u>, <u>Ratzlaf</u> v. <u>United States</u>, 510 U.S. 135, 149 (1994) (willfully violating financial anti-structuring laws); <u>Cheek</u> v. <u>United States</u>, 498 U.S. 192, 201 (1991) (willful tax evasion); <u>cf.</u> <u>Trans World Airlines, Inc.</u> v. <u>Thurston</u>, 469 U.S. 111, 126 (1985) (willfully violating the Age Discrimination in Employment Act). As the Supreme Court has explained it, "highly technical statutes" like the Internal Revenue Code and the currency structuring law present a particular "danger of ensnaring individuals engaged in apparently innocent conduct." <u>Bryan</u>, 524 U.S. at 194. To obviate that risk, their specific intent requirements "carv[e] out . . . exception[s]" to the "general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution." <u>Cheek</u>, 498 U.S. at 199-200.

Rather, Marshall's argument that the jury should have been required to find that the "illegitimate or improper intent" was unlawful rests on the Supreme Court's suggestion in <u>Bryan</u>

-8-

(dealing with firearms sales by a vendor having no license as required) that criminal willfulness generally requires knowledge that the action charged was unlawful, albeit less specific knowledge than the statutes just mentioned.  524 U.S. at 196.[1] This, as it turns out, was the position taken by the Government in a recent brief in opposition to certiorari to the Supreme Court in Russell v. United States, No. 13-7357, involving the construction of 18 U.S.C. § 1035; on the Government's concession, the Court vacated the appellate panel's contrary holding and remanded for reconsideration.  134 S. Ct. 1872 (2014).

We think it is unnecessary to decide whether the Government's position in Russell should ultimately apply to the construction of § 1701.  Even if we assume in Marshall's favor that it should, he is not entitled to a reversal here, for the reason that any error was harmless when assessed under the standard that instructional error, including omission of an element, is harmless if it is clear beyond a reasonable doubt that a rational jury would

---

[1] Marshall also cites two First Circuit cases.  The first refutes his own reading, holding that a requirement that false statements be made "knowingly and willfully . . . means nothing more in this context than that the defendant knew that his statement was false when he made it or . . . disregarded or averted his eyes from its likely falsity." United States v. Gonsalves, 435 F.3d 64, 72 (1st Cir. 2006).  The second has been vacated in light of intervening Supreme Court precedent. United States v. Aversa, 984 F.2d 493 (1st Cir. 1993), vacated sub nom. Donovan v. United States, 510 U.S. 1069 (1994).

have found guilt absent the error.  Neder v. United States, 527 U.S. 1, 18 (1999).

Marshall, to be sure, testified that he was unaware that his destruction was unlawful, insisting that his supervisors "never" addressed the issue with him and that he "was not aware there was a problem until approached by [investigators]."  This position was consistent with his emphasis, which we will mention again below, that his discards were not surreptitious, and that for some period of time his supervisors let him get away with his practice.  Indeed, the trial judge observed that if knowledge of unlawfulness were a necessary element, this would be a closer case.

But we think the case for guilt would surely have satisfied a knowledge-of-unlawfulness requirement.  When he was interviewed by the investigators regarding his conduct, Marshall admitted that he was "not saying there's any excuse for it."  The only way this admission could be squared with his claim of ignorance of the law would be to assume that he thought that throwing deliverable mail away was merely a departure from postal service practice lacking the sanction of law. But this probability is just too far-fetched.  Marshall had to have known that he was being paid to make good on the responsibility of a national governmental agency to deliver mail entrusted to it.  Since the agency was not an agent of charity, he must likewise have been aware that someone had paid money to have the Town Criers

delivered, so long as they were deliverable. No front-line employee like him could have believed that the Government's obligation was not a requirement of the law, let alone that someone in his position would not be violating the law by taking the payer's money, in effect, while deliberately refusing to provide the service paid for. There is no reasonable doubt that a rational fact-finder would have found Marshall guilty of willfully "unlawful" conduct.

Next, Marshall contends that, under any definition, the government has presented insufficient evidence to prove that he acted "willfully" in violation of 18 U.S.C. § 1701. On the contrary, however, the government presented ample evidence for a reasonable fact-finder to conclude that Marshall knowingly and willfully obstructed the delivery of mail. Marshall does not deny that he acted "knowingly" under the statute and could hardly do so. There is no question that he knew that discarding the Town Criers would result in their failure to be delivered to their intended recipients. See United States v. Schankowski, 782 F.2d 628, 633 (6th Cir. 1986) ("'[K]nowingly and willfully' as used in § 1701 requires the government to prove beyond a reasonable doubt that the defendant knew that her acts had this effect."). Nor is there any question that Marshall intended to prevent the delivery of hundreds of Town Criers to occupied residences along his route. The sheer number of discards belies Marshall's claim that he aimed to filter

out only items he thought genuinely undeliverable, and in fact Lengieza's comparison of the contents of Marshall's bin against Marshall's own edit book showed that 80 to 90 percent of the discarded Criers were deliverable. Were more needed, Lengieza's admonition to deliver "all the good Town Criers" led to a substantial, temporary reduction in the amount Marshall discarded. The evidence demands the conclusion that Marshall knew a substantial amount of his discarded mail was in fact deliverable, and meant to prevent its delivery. And, as mentioned before, it is not credible that Marshall might have thought his admittedly inexcusable actions were not unlawful.

Nevertheless, in an attempt to show good faith efforts at delivery, Marshall points out that he never sought to conceal his discarded mail, his discard bin being there for a supervisor's review, and that his heightened delivery rate during the walk-with can be explained by what he chooses to call a legitimate motive. But even leaving aside the rule that in reviewing a conviction evidentiary ambiguities are to be resolved in the Government's favor, see Symonevich, 688 F.3d at 23, neither of these facts undermines the weight of the preceding evidence. Section 1701 does not provide that a supervisor's objection or warning is a condition of liability, and an effort to pad the number of actual stops is hardly an exculpatory explanation for failing to deliver all he should have when a supervisor was looking the other way.

Ultimately, the inference to be drawn from the record is just what Marshall admitted in his interview: that he found delivering the Town Criers "a waste of energy" and tried to save all the effort he thought he could get away with.

Finally, Marshall argues that the magistrate judge denied him due process by failing to issue a scheduling order and by delaying the trial after Marshall filed his motions in limine. These contentions are baseless. Rules of the District Court for the District of Massachusetts require magistrate judges to issue scheduling orders only in criminal felony cases, see D. Mass. Mag. J. R. 7(a)(2), leaving the matter discretionary in a case of petty offense. While the magistrate judge in this case gave the parties the option of a formal pretrial order, Marshall neither requested a scheduling order nor objected to its absence. He lost nothing under the rule and was denied nothing he asked for.

As to the orders continuing the trial date, trial courts have "wide discretion to grant or deny a request for continuance," and only a serious error of law or judgment can produce the substantial prejudice to the objecting party that would warrant appellate relief. West v. United States, 631 F.3d 563, 568 (1st Cir. 2011) (quoting United States v. Fink, 499 F.3d 81, 89 (1st Cir. 2007)). Marshall argues that delaying the bench trial until March 8, 2011, prejudiced his case by allowing the Government to procure Velazquez to authenticate surveillance evidence

inadmissible without him. This is an odd argument coming from the mouth of a defendant whose own dubious decision to surprise the Government with four motions in limine the morning of the scheduled trial was the occasion for the first continuance. See Fed. R. Crim. P. 47(c)(requiring that, absent a scheduling order, written motions be served at least seven days before the hearing date). And its strangeness is not mitigated by the fact that the magistrate judge issued at least one subsequent continuance at Marshall's own request. In short, by filing motions that were untimely under the rules, Marshall prompted the first in a series of continuances, after which the Government had the forethought and the opportunity to call a witness necessary to introduce probative evidence that would presumably have been inadmissible without that witness on the original trial date. Whatever that may say about Marshall's own tactical planning, it points to no lack of justification for the first continuance and to nothing more prejudicial than legitimately incriminating evidence. To the extent that Marshall may have been caught off-guard by Velazquez's testimony, the judge offered him additional time to prepare a cross-examination, which he declined. Thus, the record fails to lend color to the suggestions that the magistrate judge abused her discretion in granting the continuances or that Marshall suffered prejudice distinct from probative evidence as a result.

## III.

The judgment of the district court is **affirmed.**