UNITED STATES of America, Appellee,

v.

Tariq PERVAZ, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Jimmie ALZAMORA, Defendant, Appellant.

Nos. 96–1535, 96–1536.

United States Court of Appeals, First Circuit.

Heard March 3, 1997.

Decided June 24, 1997.

William J. Murphy, Providence, RI, for appellant Tariq Pervaz, Thomas G. Briody, Providence, RI, for appellant Jimmie Alzamora.

Sheldon Whitehouse, United States Attorney, Providence, RI, with whom Andrew J. Reich, Assistant United States Attorney, was on brief for appellee.

Before BOUDIN, Circuit Judge, BOWNES, Senior Circuit Judge, and LYNCH, Circuit Judge.

BOWNES, Senior Circuit Judge.

Defendants/Appellants Jimmie Alzamora and Tariq Pervaz were indicted and charged with seven counts of fraud and related activities involving access devices to telephone calls transmitted by cellular phones, in violation of 18 U.S.C. §§ 1029(a)(1), (a)(2), (a)(3), (a)(4), (a)(5), (a)(6), and § 1029(b)(2) (conspiracy to commit offenses).

There was a hearing in the district court on a motion to suppress filed by Alzamora and Pervaz. The suppression motion was denied. Alzamora and Pervaz entered conditional pleas of guilty to all seven counts of the indictment, reserving their right to appeal the district court's denial of the suppression motion.

Alzamora was sentenced to fourteen months imprisonment and ordered to pay restitution in the amount of $190,275.33.

Pervaz was sentenced to eighteen months imprisonment and ordered to pay restitution in the same amount as Alzamora—$190,-275.33. Both defendants appeal their convictions and the restitution order. Pervaz has not filed a brief on appeal; he has chosen to rely on the brief filed by his co-defendant Alzamora. Except as noted otherwise, we treat both defendants as one in this opinion.

## STANDARD OF REVIEW

The applicable standard of review has been set forth in detail in *Ornelas v. United States,* — U.S. —, — – —, 116 S.Ct. 1657, 1661–63, 134 L.Ed.2d 911 (1996). We condensed that teaching in the recent case of *United States v. Khounsavanh,* 113 F.3d 279, 282 (1st Cir.1997):

In reviewing a denial of a suppression motion, the district court's ultimate legal conclusion, including the determination that a given set of facts constituted probable cause, is a question of law subject to *de novo* review. *See Ornelas v. United States,* — U.S. —, —, 116 S.Ct. 1657, 1659, 134 L.Ed.2d 911 (1996); *United States v. Zayas–Diaz,* 95 F.3d 105, 111 n. 6 (1st Cir.1996). The district court's findings (if any) of historical facts—"the events which occurred leading up to the ... search," *Ornelas,* — U.S. at —, 116 S.Ct. at 1661—must be upheld unless they are clearly erroneous. *See id.* at —, 116 S.Ct. at 1663; *Zayas–Diaz,* 95 F.3d at 111 n. 6. A reviewing court must "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas,* — U.S. at —, 116 S.Ct. at 1663. But "the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to ... probable cause" is a mixed question of law and fact which we review *de novo. Id.* at — – —, 116 S.Ct. at 1661–63.

## THE FACTS

### A) Background

Defendants were convicted of taking part in a telephone "cloning" operation. Some background information is necessary. Cellular phones transmit messages by radio

waves, not wires. Telephone companies, e.g., AT & T, Sprint, and MCI, offer their customers the use of an access device number called a mobile identification number (MIN), which allows customers to make and receive both local and long distance telephone calls through their cellular telephone carriers, e.g., Cellular One, Mobile Communications, SNET, and COMCAST. Cellular telephone customers are also assigned Electronic Serial Numbers (ESN) for their phones. Both MINs and ESNs are access devices within the meaning of the statute, 18 U.S.C. § 1029(e)(1).

Cellular telephone subscribers are assigned a combination of an MIN and an ESN to access cellular service. The MIN/ESN combination number also is used by the carrier for billing its cellular phone subscribers. The MIN/ESN access combination is programmed on "Erasable Programmable Read Only Memory" (EPROM) located on a computer chip which is part of the circuitry of the telephone.

A cellular telephone "cloning" operation is a scheme to defraud in which MIN/ESN combinations issued to subscribers are stolen and reprogrammed on a nonsubscriber's cellular telephone so as to obtain use of the subscriber's account. The cloning is accomplished by attaching the nonsubscriber's cellular phone to a personal computer through a specially designed interface cable. The cable, used with customized cloning software, gains access to the "EPROM" computer chip and the stolen MIN/ESN number is programmed onto the computer chip in the nonsubscriber's cellular phone. Customers pay those running the fraudulent scheme a fee to use the stolen MIN/ESN numbers to make local, long distance or international phone calls which are billed to the stolen account. The fee is, of course, less than the regular rates. The subscriber does not know that his access number is being used by others until he gets his telephone bill.

### B) Suppression Hearing Evidence

At the outset of our rehearsal of the evidence adduced at the suppression hearing, we caution the reader that the dates of conversations and events are an important factor in our determination whether the employees of Cellular One of Boston (COB) were acting as government agents. The case, for our purposes, begins on September 13, 1995, when employees of Southern New England Telephone Company (SNET) and Cellular One of Rhode Island (CORI) informed the U.S. Secret Service that a disproportionately large number of international telephone calls were being made from a cellular phone (or phones) located in Cranston, Rhode Island.

The Secret Service, through Special Agent James Barnard, called CORI the next day (September 14) for further information and talked to Dan Mott, a service technician. Mott told Barnard that a number of the international calls had been made with MINs which were not in the calling area to which the MINs were ordinarily designated. Barnard was further informed by Mott that the calls were being made through one cellular phone location. Barnard asked if Mott had any equipment that could pinpoint the exact site of the calls; Mott said that he did not have such equipment.

On September 14, 1995, Barnard called the Secret Service Office in Boston and inquired whether it had any site-location equipment. He was told that it did have such equipment but that it was not available. Barnard was also told that COB might be able to help him.

Barnard called COB later the same day (September 14) and talked to Ron Anderson. He explained the situation and asked if COB had equipment that could locate the source of the cloned calls. Barnard advised Anderson that COB customers were among those being defrauded by the cloning operation. Anderson told Barnard that COB had equipment that would help locate the exact source of the calls, but that he would have to check with COB's legal department to see whether the equipment could be used in Rhode Island. After being told by Anderson that COB's customers were being defrauded, COB's legal department advised Anderson that the tracking equipment could be used in Rhode Island. Instead of calling Barnard back as promised, Anderson and two other COB employees went to Cranston, Rhode Island, the afternoon of September 14 in a van carrying the tracking equipment.

The frequencies used to make the international calls were obtained by Anderson from SNET. Using these frequencies, Anderson and his crew proceeded in the van to the general source area of the calls. The tracking equipment was then put into operation. Anderson and the two other men (Dan Valios and Rick Wade) monitored the frequency of the cellular phone calls and also listened to telephone conversations. Wade testified that they could have determined the source of the phone calls without listening to the phone conversations, but that the audio interception established that the tracking equipment was working properly. He also testified that the intercepted conversations were not in English and that none of those in the van understood what was being said. After driving around Cranston for about half an hour, the tracking equipment pointed to two adjacent houses as the probable source site. Wade got out of the van and using a hand-tracking device pinpointed the source of the calls as the left side of the first floor of a multi-family dwelling with the address of 156–158 Woodbine Street.

Anderson called Agent Barnard after the source phone site had been pinpointed and informed Barnard of what had been done. The following day, September 15, Barnard applied for and obtained a warrant to search the apartment on the left side of the building at 156 Woodbine Street, Cranston, Rhode Island. The warrant was executed on September 15. Federal agents arrested defendants on the premises and seized a number of cellular telephones, computer equipment and other evidence of the cloning operation.

### THE ISSUES

■ Before we address the main issues—whether COB's employees were acting as government agents, and the legality of the search warrant—we consider two issues raised by the government. The first is the government's argument, not raised in the district court, that because neither defendant had a privacy interest in the apartment searched, neither had standing to challenge the legality of the warrant. The government argues that it had no duty to assert a lack of privacy interest below because defendants had the burden of proving it. We are reluctant to allow the government to trap an unwary defendant by raising a lack of privacy interest for the first time on appeal unless it is absolutely clear that the defendant had no privacy interest in the premises, vehicle, or container searched. *See United States v. Soule*, 908 F.2d 1032, 1034–36 (1st Cir.1990); *United States v. Miller*, 636 F.2d 850, 853–54 (1st Cir.1980).

This is not such a case. The following facts can be fairly found or inferred from the record: Defendant Pervaz leased the premises. He and defendant Alzamora were friends or, at least, partners in crime. Alzamora moved into the apartment where the fraudulent phone calls were made and remained there several days with the blinds drawn. Both defendants were in the apartment when the warrant was executed. These facts are not sufficient for us to decide the privacy question one way or the other.

In *Combs v. United States*, 408 U.S. 224, 226–27, 92 S.Ct. 2284, 2285–86, 33 L.Ed.2d 308 (1972), the Court held that where the court of appeals had found no standing and the government had not challenged defendant's standing in the district court, the issue should be remanded to the district court so the defendant could have an opportunity to show standing. In *United States v. Bouffard*, 917 F.2d 673 (1st Cir.1990), the government conceded standing in the district court and on appeal, but a privacy interest was not apparent on the record. We held: "Considerations of fundamental fairness warrant remand in order to afford the defendant an opportunity to attempt to establish the requisite expectation of privacy." *Id.* at 677. There are cases in other circuits that are directly critical of the government's failure to address standing in the district court. In *United States v. Dewitt*, 946 F.2d 1497, 1500 (10th Cir.1991), the court held: "The government offers no excuse for its failure to raise the standing issue in a timely fashion at the suppression hearing. Accordingly, the argument is waived." The court relied on *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). In *United States v. Morales*, 737 F.2d 761, 763 (8th Cir.1984) (footnote omitted), the Eighth Circuit held:

Despite appellant's failure to prove that he had a legitimate expectation of privacy in room 141, we nonetheless find that because of the inconsistent positions the government has taken at trial and on appeal concerning appellant's alleged disclaimer of knowledge of the key, the government has lost its right to challenge appellant's standing.

If the privacy question was vital, we would, at the very least, remand to the district court for factual findings. Because, however, it is not, we will assume standing for purposes of this appeal.

The other argument the government makes is purely legal: There was no violation of the Electronic Communications Privacy Act because locating a transmitter broadcasting on a radio frequency does not constitute "intercepting" a communication under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. § 2510 *et seq.* We are aware that there are cases holding that users of cellular phones are not protected by the Fourth Amendment. *See In Re Askin,* 47 F.3d 100, 104 (4th Cir.1995); *United States v. Smith,* 978 F.2d 171, 174–76 (5th Cir.1992). The operative facts in these cases, however, took place before the provision in 18 U.S.C. § 2510(1) expressly excluding the radio portion of a cordless telephone communication from the protection of the Act was deleted by amendment in 1994. *See* Pub.L. No. 103–414 § 202(a)(1). Moreover, in the instant case, more took place than just locating the source of a radio frequency; those tracking the broadcast frequency listened to the actual conversations being transmitted. This appears to be covered by the Act. We see no point, however, in deciding what appears to be a thorny question not necessary to our decision. We follow the district court's lead and assume, without deciding, that the Act applies.

### A) *Issues Raised by Defendants*

■ The first issue is whether the employees of Cellular One of Boston (COB) were acting as government agents when they tracked the radio frequency of the cloned cellular phone. Under 18 U.S.C. § 2511(2)(a)(i), it is not unlawful for the employee of a provider of wire or electronic communication services whose facilities are used in the transmission of wire or electronic communication, "to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service...." The following subsection, (2)(a)(ii), authorizes such employees "to provide information, facilities, or technical assistance to persons authorized by law to intercept wire, oral, or electronic communications...."

It is evident that COB's employees, on learning from Secret Service Agent Barnard that COB customers were being defrauded by the cloning operation, had a statutory right to track the radio frequency of the cloned phone. If the COB employees were government agents, however, the requirements of the Fourth Amendment would override statutory authority.

The question remains, were the employees acting as agents of the government? *See United States v. Mendez-de Jesus,* 85 F.3d 1, 2–3 (1st Cir.1996) (Fourth Amendment does not apply to private action unless private party acted as agent or instrument of government.)

Various tests have developed for determining whether a private entity has acted as a government agent. For example, *see United States v. Pierce,* 893 F.2d 669, 673 (5th Cir. 1990). The Sixth Circuit in *United States v. Lambert,* 771 F.2d 83 (6th Cir.1985) has stated the rule as follows:

A person will not be acting as a police agent merely because there was some antecedent contact between that person and the police. *United States v. Coleman,* 628 F.2d [961] at 965 [(6th Cir.1980)]. Rather, two facts must be shown. First, the police must have instigated, encouraged or participated in the search. *Id.* Second, the individual must have engaged in the search with the intent of assisting the police in their investigative efforts.

*Id.* at 89. The Ninth Circuit has held that, "two of the critical factors in the 'instrument

or agent' analysis are: (1) the government's knowledge and acquiescence, and (2) the intent of the party performing the search." *United States v. Walther,* 652 F.2d 788, 792 (9th Cir.1981). In *United States v. Attson,* 900 F.2d 1427, 1433 (9th Cir.1990), the Ninth Circuit added a gloss to its rule:

> [A] party is subject to the fourth amendment only when he or she has formed the necessary intent to assist in the government's investigative or administrative functions; in other words, when he or she intends to engage in a search or seizure. However, under this test, the fourth amendment will not apply when the private party was acting for a reason that is independent of such a governmental purpose.

In *United States v. Smythe,* 84 F.3d 1240, 1243 (10th Cir.1996), the Tenth Circuit requires that the government must "affirmatively encourage or instigate the private action." This is determined by "the totality of the circumstances."

■] We think that any specific "standard" or "test" is likely to be oversimplified or too general to be of help, and that all of the factors mentioned by the other circuits may be pertinent in different circumstances: the extent of the government's role in instigating or participating in the search, its intent and the degree of control it exercises over the search and the private party, and the extent to which the private party aims primarily to help the government or to serve its own interests.

Our review of the suppression hearing evidence and the district court's findings of historical facts is made through a lens adjusted for clear error viewing. It is probably true that there would have been no search made by COB employees were it not for Agent Barnard's telephone call inquiring about equipment for locating the source of the transmissions and informing COB that its customers were being defrauded. But there is no evidence that Barnard authorized the search or even knew about it. COB employ-

ee Anderson in answer to Barnard's query about whether COB had source-location equipment said that it did, but he would have to check with the legal department to see if it could be used in Rhode Island. Anderson told Barnard that he would call him back. He did not do so. Instead, he and the other two employees went to Cranston, Rhode Island, and started tracking the radio signals on their own. Their motivation was that COB's customers were being defrauded. Barnard was ignorant of what was transpiring. COB had a statutory right to investigate and search for the sources of the radio transmitted phone calls. It had a legitimate independent motivation for its search: to prevent a fraud from being perpetrated on its customers. That is the purpose of 18 U.S.C. § 2511(2)(a)(i) and (ii).

Our combined clear error review of the historical facts and *de novo* review of the district court's conclusion compels a holding that there was no government action in this case.[1]

## B) *The Affidavit and Search Warrant*

■] We next consider defendant's claim that the search-warrant affidavit submitted by Special Agent Barnard lacked probable cause. Keeping in mind the standard of review, we have examined the eight-page affidavit meticulously.

Paragraph 1 identifies the affiant and explains that his routine duties include "the investigation of violations of federal laws pertaining to the unauthorized use of access devices." The next paragraph, (2), describes the premises to be searched. This will be discussed in detail in the next part of the opinion.

Paragraph 3 states that the government (Secret Service) has been conducting an investigation of a telephone fraud scheme in Cranston, Rhode Island. The next paragraph gives the names and addresses of indi-

---

1. *Ornelas* called for *de novo* review of the district court's conclusion that a given set of historical facts rose to the level of probable cause. —— U.S. at ——, 116 S.Ct. at 1659. The Court did not specifically decide whether a similar *de novo* standard should be applied to the legal question

at issue here: whether a private entity has acted as a government agent for Fourth Amendment purposes. Because the defendants' appeal fails even under the more searching *de novo* standard, we assume without deciding that the *Ornelas de novo* standard applies.

viduals with whom the affiant had spoken in the course of the investigation.

Paragraph 5 explains the use of MIN numbers as an access device, which we have already covered in the Facts section of this opinion. In paragraph 6, the affiant expresses his belief that individuals are using telephones at the location described in paragraph 2 to commit a telecommunications fraud scheme. This paragraph goes on to state that individuals have "captured" valid MIN and ESN numbers "into mobile telephones" "and are using these numbers fraudulently to make telephone calls internationally by way of telephone credit card account numbers."

Paragraph 7 explains that the MIN/ESN combination is programmed on "Erasable Programmable Read Only Memory (EP-ROM)", located on a computer chip within the general circuitry of the telephone. Paragraph 8 describes a cellular telephone cloning operation. This has already been set forth in the Facts section of this opinion.

Paragraph 9 describes a "call sell" operation by which a customer pays a fee for making long-distance phone calls which are billed to the stolen credit card account numbers. Paragraph 10 recites that long-distance calls are being made by unidentified individuals from 156 Woodbine Street, Cranston, Rhode Island, from "cloned" cellular phones. It is then stated:

> After accessing a long distance carrier the individual enters a credit card number to which to bill the international call. Subsequently, the individual defrauds the mobile telephone company of the revenues due them for air time and defrauds the issuing credit card company for revenues due them for tolls. The defrauded company will have to issue the subscriber a credit for the fraudulent billing, thereby, incurring the monetary loss.

Paragraph 11 states in effect that Secret Service Agent John Enright received information from Cheryl Maher, Fraud Manager of Cellular One Rhode Island, that individuals were using "cloned" phones "to access

long distance carriers such as MCI, Sprint and AT & T and are using credit card telephone numbers to make international calls." Paragraph 12 recites a telephone call received by Agent Barnard from Jan Mott, a Cellular One technician, giving him essentially the same information recited in paragraph 11. Paragraph 13 recites further information received from Mott. It concludes: "Mott stated that since the telephone calls were mostly being made from one site (site 29) it indicated that the caller was not mobile but was stationary."

Paragraph 14 states that on September 14, 1995, Agent Barnard (affiant) spoke with Secret Service Agent Rodriguez of the Financial Crimes Division of the Secret Service. Rodriguez told him that when a caller using a cellular phone accesses a credit card company such as MCI, Sprint or AT & T through an access number, the credit card number used is not recorded by Cellular One. Paragraph 15 recites briefly the same facts we have described fully in the government-agency section of this opinion.

Paragraph 16 states that Rick Wade, an employee of Cellular One, had its telephone switch office monitor the international telephone calls from Cranston, Rhode Island.[2] This established that twenty-five telephone numbers were identified as originating from 156 Woodbine Street, Cranston, Rhode Island. The total time of the calls was 151 hours, normally billed at $.75 per minute. The calls continued over a 24–hour period. Paragraph 17 states that Maher (Fraud Manager of Cellular One Rhode Island, see paragraph 11), provided a partial list of telephones that appear to have been cloned and are being used in the Cranston, Rhode Island, area. The numbers are listed.

Paragraphs 18, 19, and 20 recite the experience and training of the affiant. Paragraph 21 is the affiant's "probable cause" statement.

Based on our *de novo* review of the affidavit and the facts leading to the district court's conclusion that there was probable cause to issue the warrant, we hold that

---

**2.** It is clear from Wade's testimony at the suppression hearing that this was done *after* the apartment at 156 Woodbine Street had been pinpointed as the source of the cloned calls.

there was probable cause for issuing the search warrant.

■ The next issue is the validity of the warrant. Defendant claims that the warrant was defective because it inaccurately described the place to be searched. The warrant affidavit described the premises to be searched as follows:

I make this affidavit in support of a search warrant for the two bedroom first floor apartment of the residence located at 156 Woodbine Street, Cranston, Rhode Island, further described as a three story, wood framed building with a yellow front, brown trim and brown sides. The number 156 appears on a post next to the door on the left as one faces the building. On the first floor are two apartments which are accessed through the door marked 156. The apartment for which this warrant is sought is the two bedroom apartment on the left side of the first floor.

The pertinent part of the search warrant states:

In the Matter of the Search of

(Name, address or brief description of premises, property or premises to be searched)

Two bedroom first floor

apartment of the residence SEARCH WARRANT

located at 156 Woodbine CASE NUMBER:

St., Cranston, RI, further 1:95–M–020816 described as a three story,

wood framed building with

a yellow front, brown

trim and brown sides.

TO: *Any Special Agent of the Secret Service* and any Authorized Officer of the United States

Affidavit(s) having been made before me by *James M. Barnard* who has reason to believe that _____ on the person of or *x* on the property or premises known as (name, description and/or location)

Two bedroom first floor apartment of the residence located at 156 Woodbine St., Cranston, RI, further described as a three story, wood framed building with a yellow

front, brown trim and brown sides. The number 156 appears on a post next to the door on the left as one faces the building. On the first floor are two apartments which are accessed through the door marked 156. The apartment for which this warrant is sought is the two bedroom apartment on the left side of the first floor.

Defendants argue that the warrant did not meet the particularity requirement of the Fourth Amendment. They point out correctly that the number 156 was on the left post at the top of the stairs leading to the entrance landing and that the number 158 was on the right post at the top of the stairs. It is stated in defendant's brief at page 26: "But the warrant does not indicate which direction one must face in determining right from left." This statement is not correct. The warrant states: "The number 156 appears on a post next to the door *on the left as one faces the building.*" (Emphasis added).

Defendant also argues that, because of the two different address numbers, those executing the warrant should have called the Magistrate and clarified what apartment was to be searched. The record of the suppression hearing establishes conclusively that Agent Barnard knew exactly what apartment was to be searched and proceeded directly to it. Barnard testified in effect as follows.

There were two entrance doors to the building containing the apartment to be searched. There were two posts on either side of the steps when you get to the entrance landing. The post on the right-hand side of the steps as one faced the building had the number 158 on it. The post on the left side carried the number 156 on it. Barnard entered the building through the 156 door entrance. He took a short step to the right and proceeded down a hallway to an apartment on the left side of the first floor of the building. This apartment had the number 156A on the door. This was the apartment that was searched.

One of defendants' arguments is that the defendants actually lived at 158 Woodbine Street, not 156. The number on the door of the apartment searched—156A—effectively refutes this claim.

We find and rule that an objective law enforcement officer would not be confused by the two different address numbers and that the particularity requirement of the Fourth Amendment was met. The only confusion was that sown by the attorneys for the defendants at the suppression hearing.

■ Even, however, if the address given in the warrant may have been somewhat suspect our circuit case law teaches that any uncertainty raised by the two address numbers did not invalidate the search warrant.

The leading case in this circuit on the adequacy of the description of the location to be searched is *United States v. Bonner*, 808 F.2d 864 (1st Cir.1986). In *Bonner* we stated:

> The manifest purpose of the particularity requirement of the Fourth Amendment is to prevent wide-ranging general searches by the police.
>
> The test for determining the adequacy of the description of the location to be searched is whether the description is sufficient "to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched."

*Id.* at 866 (citations omitted). In *Bonner* the affidavit contained a detailed physical description of the premises to be searched and its address. The address, however, was omitted from the warrant. We upheld the validity of the warrant, stating:

> We hold that the Bonner residence was described with sufficient particularity, and although the address was inadvertently omitted, there was no reasonable probability that another premises might be mistakenly searched; thus, the search warrant was valid.

*Id.* at 867. Three subsequent cases have relied on the *Bonner* analysis and holding: *United States v. Cunningham*, 113 F.3d 289 (1st Cir.1997); *United States v. Estrella*, 104 F.3d 3, 9 (1st Cir.1997); *United States v. Hinds*, 856 F.2d 438, 441 (1st Cir.1988). This precedent seals the issue.

We are aware, of course, that the district court decided the warrant issue on the basis of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). We do not reach the *Leon* approach, and therefore, there is no need to discuss defendant's claim of lack of good faith by the searching officers.

■ Defendant also claims that the district court abused its discretion when it raised the issue of the accuracy of Cellular One's Boston Tracking Equipment, but then denied defendant's motion to have the equipment independently examined. The record of the suppression hearing discloses that this is not exactly what happened. The district court questioned COB employee Wade about how the source-location was determined. She asked Wade "to tell us how the equipment works in order for you to be able to make the determination in laymen's terms." Wade then explained what he did and how the equipment worked. The court then asked further questions about what Wade did, and what he did or did not tell Barnard. The court's examination of Wade ended with the following colloquy:

Q. So that before the warrant issued, you hadn't shown the equipment to the Government agents and explained how you were able to isolate the signal?

A. I don't believe I did.

Q. Did they ever ask you what kind of equipment you were going to use to do this?

A. No.

Q. Did they ever ask you the reliability of the equipment you were going to use?

A. No.

We construe the court's questions, not as evincing doubt on its part as to the reliability of the tracking equipment, but as seeking what information about the equipment had been given to the government, which was very little.

We agree with the district court that the motion came too late for consideration. Under Fed.R.Crim.P. 16(a)(1)(C) defendant had a right to inspect the tracking equipment prior to trial. Clearly, defendant never thought about inspecting the equipment until the court's last question to Wade. This was

too late. We have examined the record carefully and there is nothing to even suggest that the tracking equipment was unreliable in any way. We hold that the district court did not err in denying defendant's motion.

■] The final issue is whether the district court erred in determining the amount of loss. The district court ordered each defendant to pay restitution in the amount of $190,275.33. This sum represented the amount that the defrauded telephone companies would have been paid if the calls had been made legitimately. Under U.S.S.G. § 2B1.1, application note 2 states in pertinent part: "Loss means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue." The pertinent part of note 3 states: "For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information."

Defendants assert that the amount used was erroneous because it "reflects both the costs associated with processing the calls and a profit margin for the various cellular phone carriers and providers." No cases are cited for this novel proposition. Defendants rely on the following sentence in application note 2 of U.S.S.G. § 2B1.1: "Loss does not include the interest that could have been earned had the funds not been stolen."

We are not persuaded. We do not think that profit can be equated with interest. Profit is an ingredient of the fair market value of goods or services that can be sold and purchased.

We discern no error, plain or otherwise, in the district court's determination of the amount of restitution.

The judgment of the district court is *affirmed.*