# United States Court of Appeals
## For the First Circuit

No. 07-2320

UNITED STATES,

Appellee,

v.

MAXIMANO SILVA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Boudin, Stahl, and Lipez,
Circuit Judges.

Jay Markell for appellant.
Maximano Silva on brief pro se.
Kelly Begg Lawrence, Assistant United States Attorney, with
whom Michael J. Sullivan, United States Attorney, was on brief,
for appellee.

January 23, 2009

**STAHL, Circuit Judge.** Defendant-Appellant Maximano Silva appeals both his conviction and sentence for conspiracy to obtain and obtaining controlled substances by fraud, health care fraud, identity theft, and aggravated identity theft. He argues, inter alia, that his conviction rested on evidence illegally obtained and that the district court improperly calculated his sentence. Finding no error, we affirm.

## I. Facts and Procedural Background

The conduct underlying the charges occurred during two separate time periods, in 2000 and in 2004-2005. On May 31, 2000, police officers searched Silva's home pursuant to a warrant and discovered blank and forged prescription forms, pharmacy bags, receipts and pill bottles for various narcotics, pieces of identification in the names of person other than Silva, and other items that linked Silva to identity theft and drug fraud activities. The subsequent police investigation determined that Silva forged prescriptions for narcotics and provided his wife and a friend with fake identification to facilitate the filling of the fraudulent prescriptions.

Silva's 2004-2005 participation with his wife and his father in a "doctor shopping" conspiracy provided the basis for the remaining charges.[1] The scheme resulted in at least five doctors

---

[1] The gap in the conduct underlying the charges is explained by Silva's incarceration in 2001. On August 23, 1999, Silva was convicted of obtaining controlled substances through false

-2-

in different Massachusetts towns prescribing pain medications for Silva's father at the same time.  Silva also forged several prescriptions for narcotics in the doctors' names, and Silva's father or wife filled the prescriptions at various pharmacies in Massachusetts.

On October 27, 2005, the grand jury returned a 24-count indictment charging Silva with the following crimes: conspiracy to obtain and obtaining controlled substances by fraud, in violation of 21 U.S.C. §§ 843(a)(3) and 846; health care fraud, in violation of 18 U.S.C. § 1347; identity theft in connection with obtaining controlled substances by fraud, in violation of 18 U.S.C. § 1028(a)(7); and aggravated identity theft in connection with making false statements, in violation of 18 U.S.C. § 1028A.

Silva filed a motion to suppress evidence seized in the May 31, 2000, search, asserting that the warrant was not based on probable cause.  During two days of evidentiary hearings, Detective Charles Devlin ("Devlin") and Silva's brother Norman testified. Devlin's search warrant affidavit listed multiple sources of information that linked Silva to identity theft activities,

---

pretenses and sentenced to probation.  Silva subsequently violated his parole and was incarcerated on January 19, 2001.  Therefore, the charges are based on Silva's conduct before his incarceration in 2001 and after his release, which apparently occurred some time in 2002.

including statements made by Norman.[2]  On May 9, 2000, Norman complained to Devlin at the Hudson police station that Silva had accrued traffic tickets and medical bills in Norman's name.  Norman explained that he had entered Silva's bedroom and seen a speeding ticket in his name, as well as a driver's license and phone bill of someone in Marlborough.[3]  Devlin asked Norman to bring the items to the station.  Devlin later testified that he assumed Norman had taken the items upon first discovering them and did not realize Norman twice reentered Silva's bedroom.  On May 9, Norman reentered Silva's room, returned to the station, and provided Devlin with a copy of the speeding ticket and medical bills.  Devlin inquired about the driver's license and cell phone bill and upon learning that they were still at the family home, asked Norman to bring the documents so that the police could get a search warrant.  Norman

[2] The information on which Devlin also relied included the following: a statement by John D'Angelo ("D'Angelo") that his wallet was stolen in November 1999 and he received a cell phone bill in March 2000 indicating that an account had been opened in his name and a phone mailed to Silva's address; Devlin's statement that he called the phone number associated with D'Angelo's name on March 7, 2000, and a voice like Silva's answered the phone; Devlin's investigation of a shoplifting incident allegedly involving Silva's cousin, Elcid Silva, which established that Silva himself shoplifted and assaulted a store security officer but falsely identified himself as Elcid; and Devlin's investigation of two traffic tickets, which established that Silva falsely identified himself as Norman when stopped by police on two occasions.

[3] Norman also told Devlin that Silva had disconnected his cell phone the same day he had received a call he suspected was from the police.

retrieved D'Angelo's driver's license and cell phone bill and on May 10, brought the items to the station.

On February 26, 2007, the court denied Silva's motion to suppress in a memorandum opinion. United States v. Silva, 502 F. Supp. 2d 143 (D. Mass. 2007). The court held Norman's first and second searches of Silva's bedroom (which yielded the traffic ticket in Norman's name) were private, noting Norman acted on his own initiative and for his own interests. The court found that the third search (yielding D'Angelo's driver's license and cell phone bill) was a government search violating the Fourth Amendment. Nonetheless, the district court found the search was valid under the independent source doctrine.

The nine-day jury trial began on March 19, 2007. Silva primarily argued that his sister and her husband, Paul Danforth ("Danforth"), who were arrested for passing forged prescriptions, committed the crimes. At trial, Silva introduced a July 2005 letter written by Danforth from jail to his wife that allegedly showed that the evidence seized in the May 2000 search belonged to the Danforths.[4] Because the parties initially believed Danforth would be unavailable to testify, Silva conceded the letter was

---

[4] The letter, in pertinent part, read as follows: "Liz, I pretty much worry about every thing that they got in your mother's house in 2000. I hope they don't find out it was us. Hopefuly [sic] Christine will not fold. I hope you explained everything to her. Don't let your mother or Max see this letter, it can Fuck us Bad."

hearsay and sought to admit it as a statement against penal interest. When it became clear Danforth would testify, Silva instead requested admission of the letter as a prior inconsistent statement pursuant to Rule 613(b). At trial, Danforth denied ownership of the evidence seized from Silva's bedroom. Danforth admitted to writing part of the letter but denied writing the portion relevant here. The court instructed the jury to consider the letter only as evidence of Danforth's credibility; Silva did not object. After a handwriting expert's testimony, the court ruled the letter was admissible but could only be considered for whether it was consistent with Danforth's testimony; again, Silva did not object.

On March 29, 2007, the jury convicted Silva on all but two counts. The court sentenced Silva to 81 months in prison and 36 months of supervised release. This appeal followed.

## II. Motion to Suppress

Silva claims the evidence obtained in the May 31, 2000, search should have been suppressed, arguing the authorizing warrant lacked probable cause absent evidence obtained in earlier, illegal searches. To support this claim, Silva asserts that his brother Norman acted as a government agent when Norman found and provided the police with various items. The district court rejected Silva's claim, finding the search warrant valid under the independent source doctrine.

We review the district court's legal conclusions in a denial of a motion to suppress de novo and its factual findings for clear error. United States v. Momoh, 427 F.3d 137, 140 (1st Cir. 2005) (citations omitted). "We will uphold a denial of a motion to suppress if any reasonable view of the evidence supports it." Id. (quoting United States v. Kornegay, 410 F.3d 89, 93 (1st Cir. 2005) (internal quotation marks and citation omitted)). We review a finding that a cleansed affidavit was sufficient under the de novo review provisions set forth in Ornelas v. United States, 517 U.S. 690 (1996), with deference to the inferences drawn from facts found by the lower court and law enforcement officers. United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005) (citing United States v. Smith, 423 F.3d 25, 31 n.4 (1st Cir. 2005)).

Silva first argues Norman's second search of his bedroom violated the Fourth Amendment, contending that Devlin "instigated and counseled [it]." The Fourth Amendment's protection against unreasonable searches and seizures applies only to government action and not "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government." United States v. Jacobson, 466 U.S. 109, 113 (1984) (quoting Walter v. United States, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)). This circuit has identified the following three factors as potentially relevant in deciding whether a private party acts as a government agent: "the extent of the

-7-

government's role in instigating or participating in the search, its intent and the degree of control it exercises over the search and the private party, and the extent to which the private party aims primarily to help the government or to serve its own interests."  United States v. Pervaz, 118 F.3d 1, 6 (1st Cir. 1997).  We will not find state action simply because the government has a stake in the outcome of a search.  Compare id. (finding phone company's interest in preventing defrauding of customers to be primary purpose for search, even though it was "probably true that there would have been no search" had government not informed company of fraud) with United States v. Corngold, 367 F.2d 1, 5-6 (9th Cir. 1966) (finding "joint endeavor" subject to Fourth Amendment where private party's purpose was solely to assist federal agents, and agents helped open boxes and inspect contents).  See also United States v. Walther, 652 F.2d 788, 792 (9th Cir. 1981) (observing that presence of officers alone, without active role in encouraging or assisting private search, does not implicate Fourth Amendment, "especially where the private party has had a legitimate independent motivation for conducting the search").

In the present case, the district court correctly determined Norman did not act as a government agent in the second search.  Although Devlin encouraged Norman to bring items to the police station, he did not participate in the search and exercised no control over the manner in which it was conducted.  Indeed,

-8-

Devlin did not tell Norman to search Silva's bedroom again because he believed Norman already possessed the items. Moreover, Norman's second search was motivated by his desire to clear his name; he returned to the station with only those items that were relevant to his concerns and that would exonerate him. Although Silva makes multiple arguments about inferences the lower court could have drawn from the evidence,[5] he has failed to shown the court's conclusions were clearly erroneous.

Silva also contends that the search warrant for the May 31, 2000, search was tainted by the evidence obtained in Norman's third search of Silva's bedroom which the district court found illegal.[6] The court conducted an independent source inquiry and held there was sufficient information to establish probable cause for the issuance of the warrant. When conducting an independent source inquiry, a court should first determine whether the police officer would have sought the warrant even without the evidence obtained from the illegal search and second, whether the warrant contains sufficient information to establish probable cause after

---

[5] For example, Silva argues it would have been easier and more efficient for Norman to have cleared the traffic ticket in court than to have continued dealing with the police and that Devlin's previous knowledge of Silva's criminal history (and Norman's lack thereof) revealed his intention to use Norman as an agent.

[6] The Government concedes Norman acted as a government agent in the third search of Silva's bedroom.

setting aside the tainted information.  Murray v. United States, 487 U.S. 533, 542 (1988); Dessesaure, 429 F.3d at 369.

Even after excising D'Angelo's license and cell phone bill, ample evidence remained, see supra note 2, such that a reasonable officer would seek a warrant considering the totality of the circumstances, see Dessesaure, 429 F.3d at 369, satisfying the first prong of Murray.  With respect to the second, probable cause prong of Murray, Devlin received D'Angelo's report and believed that Silva answered his call to the cell phone number associated with D'Angelo's name.  After Norman's initial visit, Devlin investigated the traffic stops and obtained corroborating evidence from two police officers.  Viewed objectively, this evidence, independent of any information gained from Norman's illegal search, provided probable cause to support Devlin's decision to seek a warrant.[7]

### III. **Evidentiary Ruling**

Silva next asserts that the district court incorrectly held that Danforth's letter, see supra note 4, was admissible only for impeachment purposes as an inconsistent statement.  Even if we

---

[7] We concur with the Government that Silva was not entitled to a Franks hearing because the search warrant did not contain any deliberately or recklessly false misstatements or omissions material to a finding of probable cause.  See Franks v. Delaware, 438 U.S. 154, 165 (1978).

-10-

were to entertain Silva's claim,[8] we review only for plain error. United States v. Taylor, 54 F.3d 967, 972 (1st Cir. 1995) (citations omitted); see also Olano, 507 U.S. at 733-34 (distinguishing waiver from forfeiture and discussing plain error review). Thus, Silva must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001) (citations omitted).

The district court did not err in ruling that the letter was hearsay, Fed. R. Evid. 801(c), admissible only for impeachment purposes as a prior inconsistent statement, Fed. R. Evid. 613(b). Silva insists the limited admissibility of Danforth's letter violated a constitutional right to present exculpatory evidence. But our facts differ from Crane v. Kentucky, 476 U.S. 683, 686-87 (1986), a case on which Silva heavily relies, where the Court

---

[8] The Government suggests Silva waived this claim, and we tend to agree. As we previously noted, Silva did not object when the court, over the Government's objection, instructed the jury to consider the letter only as evidence of Danforth's credibility after Silva questioned Danforth about it. Silva again did not object when the court later ruled that the letter was admissible but could be considered only for its consistency with Danforth's testimony. Moreover, Silva himself offered the letter as a prior inconsistent statement pursuant to Rule 613(b) to impeach Danforth's in-court testimony. See United States v. Mitchell, 85 F.3d 800, 807 (1st Cir. 1996) ("A party waives a right when it makes an 'intentional relinquishment or abandonment' of it.") (quoting United States v. Olano, 507 U.S. 725, 733 (1993)).

reversed a conviction after the trial judge refused to admit any evidence regarding the voluntariness of a confession after denying a pre-trial motion to suppress.  See also Holmes v. South Carolina, 547 U.S. 319, 331 (2006) (involving the complete exclusion of evidence regarding a third party's guilt).  Here, Danforth took the stand and was subject to Silva's examination, including questions regarding the letter he penned.[9]  Silva was able to present his defense throughout the trial; he called a handwriting expert and five police officers who testified about Danforth's fraudulent activities, and his lawyer, in closing arguments, strenuously argued that Danforth's testimony and the letter indicated that Silva was not guilty of the conduct in 2000.  Because the court correctly applied the evidentiary rules and as Silva was not deprived of any constitutional right, the district court did not plainly err in limiting the admissibility of Danforth's letter. See, e.g., Evans v. Verdini, 466 F.3d 141, 148-49 (1st Cir. 2006) (upholding exclusion of hearsay statement for both substantive and impeachment purposes against Sixth Amendment challenge).

## IV. Jury Instructions

Silva's objection to the district court's instruction regarding speculation also is unavailing.  On the eighth day of

_____

[9] Indeed, the trial transcript reveals that the court overruled various Government objections during the examination of Danforth and permitted use of a visual presenter so that the jury could view a copy of the letter while Danforth testified.

-12-

trial, the jury asked the court, "Can suspicion, with lack of evidence, regarding or toward any person other than the accused in the case be used to formulate reasonable doubt?" The court proposed an instruction which contained the following statement: "The verdict must be based on the evidence and the reasonable inferences to be drawn from the evidence. However, you should never speculate." Silva initially agreed with the instruction but later objected, arguing that the jury should be allowed to speculate that someone else committed the crime.

While we would review de novo a claim that an instruction embodied an error of law, United States v. Deppe, 509 F.3d 54, 58 (1st Cir. 2007); United States v. Nascimento, 491 F.3d 25, 33-34 (1st Cir. 2007), we review for abuse of discretion " whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues." United States v. Ranney, 298 F.3d 74, 79 (1st Cir. 2002) (quoting United States v. DeLuca, 137 F.3d 24, 37 (1st Cir. 1998)). To evaluate whether a reasonable likelihood exists that the jury understood the appropriate burden of proof, DeLuca, 137 F.3d at 37, this Circuit examines the instruction not in isolation but as part of the charge "taken as a whole," Victor v. Nebraska, 511 U.S. 1, 5 (1994) (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

We find that the lower court's instruction was correct as a matter of law. The court was not wrong to stress that the jury

-13-

should not speculate but instead should rely on the evidence presented.  See id. at 13 (finding instruction correct where court cautioned the jury against influence by factors beyond the evidence such as conjecture, sympathy, passion, or prejudice).  Moreover, the court explained the phrase "beyond a reasonable doubt" at least twenty-five times during its charge, compare to Ranney, 298 F.3d at 80 (finding no likelihood of confusion where the court referenced "beyond a reasonable doubt" some twenty-three times), creating more than a reasonable likelihood that the jury understood the instruction.

## V. **Sentencing**

In addition to the objections regarding the pretrial and trial proceedings, Silva appeals his sentence, contending the district court (1) applied the wrong Base Offense Level ("BOL") to his 2000 conduct, (2) used the wrong Guidelines manual, and (3) found facts at sentencing not charged in the indictment or found by the jury.  We deal with these claims summarily.

Silva first argues that his BOL should have been six, not seven.[10]  Because Silva did not previously object to this calculation, we review for plain error.  United States v. Reiner, 500 F.3d 10, 16 (1st Cir. 2007) (citation omitted).  We find no

---

[10] See U.S.S.G. § 2B1.1(a) (providing that the base offense level is "(1) 7 if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; or (2) 6, otherwise").

error in the district court's computation. Silva was convicted of two counts of identity theft under 18 U.S.C. § 1028(a)(7), in connection with obtaining controlled substances by fraud, 21 U.S.C. § 843(a)(3). These convictions subject Silva to imprisonment for not more than 20 years. See 18 U.S.C. § 1028(b)(3)(A); 18 U.S.C. § 929(a)(2). Thus, under the plain language of U.S.S.G. § 2B1.1(a)(1), see supra note 10, Silva's convictions warranted a BOL of seven.

Silva next raises an ex post facto challenge to the district court's employment of the 2006 Federal Sentencing Guidelines rather than the 1999 Guidelines.[11] In his sentencing memorandum, he stated that "the predicament defendant finds himself in does not, strictly speaking, raise [an] ex post facto [issue]" (emphasis added). Additionally, at the sentencing hearing, Silva stated, "I'm not arguing that there's some kind of ex post facto problem here that the court should sentence him under those [the 1999] Guidelines." These affirmations lead us to concur with the Government that Silva waived his ex post facto claim. See Olano, 507 U.S. at 733.

---

[11] Silva also claims that his conviction for aggravated identity theft, 18 U.S.C. § 1028A ("§ 1028A"), creates an ex post facto violation because the statute was not effective until July 15, 2004. However, Silva's conduct on November 29, 2004, and January 2, 2005, provided the basis for this conviction, and therefore, his argument is meritless.

And even under a plain error review, United States v. Cruz-Rodriguez, 541 F.3d 19, 31-32 (1st Cir. 2008), Silva's argument fails. Generally, "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a). However, if the use of that guideline results in a higher sentence than the guideline in existence at the time of the conduct, it raises ex post facto concerns. United States v. Hartunian, 920 F.2d 1040, 1041-42 (1st Cir. 1990) (employing guidelines in effect at time of offense). We look to the date of the last charged offense and the then-existing guidelines to determine whether an ex post facto issue exists. United States v. Cruzado-Laureano, 404 F.3d 470, 488 (1st Cir. 2005); U.S.S.G. § 1B1.11 cmt. 2 ("[T]he last date of the offense of conviction is the controlling date for ex post facto purposes."). Thus, the correct comparison is between the 2006 Guidelines, which the district court employed, and the 2004 Guidelines, in effect on the date that Silva's last offense of conviction was completed. The 1999 guidelines are inapplicable. See Cruzado-Laureano, 404 F.3d at 488 ("[I]t will not be necessary to compare more than two manuals to determine the applicable guideline range -- the manual in effect at the time the last offense of conviction was completed and the manual in effect at the time of sentencing."). Our

analysis of the 2004 and 2006 Guidelines reveals no relevant differences that would affect Silva's sentence.[12]

Finally, citing Apprendi v. New Jersey, 530 U.S. 466 (2000), Silva asserts the jury should have found beyond a reasonable doubt the amount of loss attributable to him because the lower court's loss calculation resulted in a six-level enhancement to his BOL for the 2000 conduct. But in his sentencing memoranda and at the sentencing hearing, Silva admitted that the street value of the drugs was $35,520. Indeed, in his brief to this Court, Silva recognizes "[t]he defendant and the government agreed that the loss was estimated to be between [$]30,000 and $70,000, and felt they did not need a hearing to establish the loss." We therefore find that Silva affirmatively waived this claim.

Further, Silva was sentenced to 81 months, at the low end of the guideline range and well below the statutory maximum of twenty years, rendering Apprendi inapplicable. See U.S. v. Randall, 287 F.3d 27, 28-29 (1st Cir. 2002) ("Apprendi does not apply to guideline findings . . . that increase the defendant's sentence, but do not elevate the sentence to a point beyond the lowest applicable statutory maximum that is subject to factfinding by a jury according to a reasonable doubt standard.") (internal quotations and citation omitted).

---

[12] The 2006 Guidelines add the offense of damaging a veteran's memorial and provide a definition for firearm.

## VI. **Silva's Pro Se Arguments**

Silva raises three additional claims in his pro se brief -- his trial counsel was ineffective in counseling Silva to sign statute of limitation waivers; a stipulation of the parties and the jury instruction related to that stipulation contained errors; and Silva received inadequate notice regarding his co-defendant's plea colloquy.

First, Silva argues that the seventeen counts stemming from his 2000 conduct are untimely and that his trial counsel was constitutionally ineffective by failing to assert a statute of limitations defense and by counseling Silva to sign statute of limitations waivers. Silva never objected to the timeliness of the indictment or quality of his representation before, during, or after his trial. Therefore, this Court reviews for plain error. United States v. Jimenez, 512 F.3d 1, 3 (1st Cir. 2007).

It is a highly unusual case when we decide questions of inefficient assistance of counsel on direct appeal as there are often factual issues that need to be determined in the first instance. See United States v. Muriel-Cruz, 412 F.3d 9, 12 (1st Cir. 2005) ("Absent extraordinary circumstances . . . we consult only the record extant at the time the district court rendered its decision.") (citation omitted). Where an attorney "fails to raise an important, obvious defense without any imaginable strategic or tactical reason for the omission, his performance falls below the

-18-

standard of proficient representation that the Constitution demands." Prou v. United States, 199 F.3d 37, 48 (1st Cir. 1999) (citations omitted). It is impossible for us to make such a finding here, lacking evidence about the waivers,[13] the conversations between Silva and his attorney, and the attorney's reasoning for advising Silva to sign the waivers. Silva explains that the waivers were signed during negotiations that occurred concurrent to a grand jury investigation, suggesting there may have been a tactical reason for the attorney to encourage them. In any event, if Silva wishes to raise these claims, he must do so on collateral review. See United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993) (appellant generally cannot raise fact-specific claims of ineffective assistance on direct review of criminal conviction).

Next, Silva asserts that a stipulation of the parties contained an error and that the district court later improperly instructed the jury on materiality. At trial, the parties stipulated that "[a] forged prescription contains a material misstatement for purposes of 18 U.S.C. § 1001 [("§ 1001")], whether it is in the form of a false date, false address or forged doctor's

_____

[13] The waiver signed by Silva on May 13, 2005, which he references, and any waivers signed during the pre-indictment period were not contained in the district court record.

-19-

signature." Silva has waived his objection to the stipulation[14] because "a stipulation as to facts also functions as a waiver of legal defenses to the establishment of the particular element to which the parties have stipulated" and therefore is not reviewable on appeal.  United States v. Meade, 175 F.3d 215, 223 (1st Cir. 1999).  Meanwhile, because Silva did not object to the court's materiality instruction, we review for plain error.  United States v. Riccio, 529 F.3d 40, 46 (1st Cir. 2008).  The court instructed the jury on the essential elements of a § 1001 violation, see United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006), and previously had instructed the jury on "material," "material misrepresentation," and "material fact" in instructions for other crimes.  We find no error, and certainly not plain error, in these proceedings.

Third, and finally, Silva takes issue with the district court's alleged failure to give advance warning of its intent to rely on evidence contained in Silva's co-defendant wife's plea colloquy to apply a two-level leadership rule adjustment pursuant

---

[14] Silva argues a forged prescription containing a forged doctor's signature cannot form the predicate for a conviction under § 1028A because a doctor's name is excluded as a "means of identification."  § 1028A criminalizes the knowing transfer, possession, or use of "a means of identification of another person."  Id. at § 1028A(a)(1).  For the purposes of § 1028A, 18 U.S.C. § 1028(d)(7)(A) defines a "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any . . . name."  Thus, in addition to being waived, Silva's contention runs afoul of the plain language of the statute.

to U.S.S.G. § 3B1.1(c). The Government referred to the colloquy in its sentencing memorandum and attached the transcript. At sentencing, the court announced its intention to rely on the colloquy for imposing the role enhancement but first offered Silva the opportunity to continue the hearing to call his wife as a witness; Silva declined. Regardless of our standard of review,[15] no due process violation occurred. Silva was alerted to the Government's use of his wife's testimony in its sentencing memorandum, and the district court offered him the time and opportunity to cross-examine her.

## VII. __Conclusion__

For the foregoing reasons, we __affirm__ Silva's conviction and sentence in all respects.

---

[15] Silva claims he preserved this issue by objecting at the sentencing hearing while the Government argues his failure to continue the case and call his wife constitutes a forfeiture.