# United States Court of Appeals
## For the First Circuit

No. 11-1236

UNITED STATES OF AMERICA,

Appellee,

v.

ANDREW SYMONEVICH,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, U.S. District Judge]

Before

Selya, Circuit Judge,
Souter,* Associate Justice,
Lipez, Circuit Judge.

Robert S. Sinsheimer, with whom Lauren Thomas and Sinsheimer
& Associates were on brief, for appellant.

Mark T. Quinlivan, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

July 31, 2012

* The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**LIPEZ**, <u>Circuit Judge</u>.   In February 2009, Andrew Symonevich was indicted on one count of conspiracy to distribute, and to possess with the intent to distribute, cocaine and heroin in violation of 21 U.S.C. §§ 841(a)(1), 846.   He moved to suppress evidence recovered during the search of a car in which he was a passenger.   The district court denied Symonevich's motion to suppress.   After a four-day trial, the jury convicted Symonevich of the charged offense.

Symonevich now appeals the district court's denial of his motion to suppress and challenges the sufficiency of the evidence for his conviction.   Alternatively, he demands a new trial because of the improper admission of certain testimony and charts and the inadequacy of the conspiracy instruction given to the jury.

We affirm.

## I.

We recount the facts of the case in the light most favorable to the verdict.   <u>United States</u> v. <u>Mubayyid</u>, 658 F.3d 35, 41 (1st Cir. 2011).

### A. The Wiretap Investigation

As part of its ongoing investigation of drug trafficking by a group known as the Duran Gomez organization, the Drug Enforcement Agency ("DEA") obtained permission to wiretap six telephone numbers associated with the organization, referred to as target telephones, or "TT" numbers one through six.   Calls from

Symonevich were intercepted on three days in November 2008 on TT-2, a so-called "customer line."

On November 2, through a series of seven intercepted phone calls, Symonevich arranged to buy 30 grams of heroin at a McDonald's off Interstate 495 in Massachusetts. Four days later, on November 6, Symonevich arranged through a series of phone calls to buy 50 grams of heroin and one ounce of cocaine. During one of the intercepted calls, an individual known as "Tony" asked Symonevich what kind of car he was driving. Symonevich then asked an unidentified male, "What's this? What kind of car is this?" The unidentified male answered that they were in a green Subaru. "Tony" was later identified as Wilson Ariel-Soto, the alleged leader of the drug trafficking organization.

On November 12, agents intercepted a number of calls between Symonevich and Ariel-Soto, during which Symonevich arranged to purchase 30 grams of heroin. After Symonevich's first recorded call at 1:21 p.m., DEA agents sent unmarked surveillance units toward Interstate 495 to follow Symonevich. Massachusetts State Police Sergeant James Bazzinotti, who was assisting the DEA with surveillance during the investigation, observed a green Subaru and followed it. After surveillance units observed what DEA agents believed to be a meeting between Symonevich and Ariel-Soto's drug courier, agents planned to stop Symonevich. In the meantime,

however, Bazzinotti stopped at a traffic light and lost sight of the Subaru, which he only saw again after it had been stopped.

**B. The Vehicle Stop**

Symonevich was arrested on November 12 after a traffic stop that commenced at approximately 4:18 p.m. and was apparently unrelated to the DEA investigation and Bazzinotti's surveillance. The arresting officer, Massachusetts State Trooper Sweeney, was patrolling and observed a broken side tail light on the green Subaru in which Symonevich was traveling. Sweeney pulled his police cruiser up behind the Subaru and initiated a stop by activating his blue lights. As he turned on his lights, Sweeney observed the passenger, Symonevich, "lean down as if placing or retrieving something from underneath his seat." Sweeney testified that this movement caused him concern for his safety. The Subaru slowly pulled into the breakdown lane and stopped. Sweeney approached the vehicle on the passenger's side where he observed Symonevich in the passenger seat looking "completely ashen faced" and "scared to death."

Sweeney asked Symonevich and the driver, later identified as Gerard Adair, where they were going. Adair first said that he had been visiting his grandmother. In response to further questioning, he stated that he had met a girl online and was going to meet up with her but could not find her. Sweeney asked Symonevich if he was related to Adair. Symonevich responded that

he was just going for a ride with his friend. When Sweeney asked Adair for his license and registration, he observed that Adair's hand was shaking as he handed Sweeney his driver's license. Sweeney returned to his cruiser to run a record check and radioed for backup. Trooper Brian Sweet arrived shortly thereafter.

After informing Sweet of his observations, Sweeney went back to the Subaru and asked Symonevich to exit the vehicle. Symonevich complied. As Symonevich exited, Sweeney and Sweet smelled the stale odor of marijuana coming from Symonevich's clothing. Sweeney took Symonevich to the rear of the Subaru and asked him why he had reached under the seat as Sweeney pulled them over. After he first said that he was putting a piece of paper down, Symonevich revised his statement, saying that he had actually put a can of fix-a-flat under the seat. Sweeney asked Symonevich why he had the can. Symonevich responded that he had it "in case we get a flat." Sweeney told Symonevich that his answer gave him concern for his safety. Although Symonevich was not under arrest, Sweeney wanted him to sit in the back of the police cruiser while Sweeney spoke to Adair. Symonevich complied.

Sweeney approached Adair and asked what Symonevich had put under the seat. Adair said that he did not know. Sweeney asked if there were weapons in the car. Adair replied, "Not that I know of." Sweeney asked permission to search the car and Adair declined. Sweeney nevertheless searched the car because he wanted

to be sure there was nothing under the seat that posed a safety threat. About three-quarters of the way through the stop, Sweeney got a radio call informing him that Symonevich was also the subject of an ongoing DEA investigation.

Sweeney looked under the passenger seat and found a can of tire puncture sealant. He picked it up and observed that the weight was not consistent with a can of tire sealant. Sweeney shook the can and felt something solid move around inside. He looked at the bottom of the can, saw that it was slightly separated from the can, unscrewed the bottom, and found a wad of paper towels and three bundles of brown substances that he believed to be packages of heroin.[1] Sweeney placed Symonevich and Adair under arrest.[2]

## II.

Symonevich makes four arguments on appeal: (1) the district court erred in denying his motion to suppress on the basis that, as a passenger in the vehicle, he lacked standing to challenge the seized evidence; (2) the district court abused its discretion in admitting certain testimony and charts; (3) there was

---

[1] Later chemical analysis of the recovered substance showed 30.44 grams of heroin.

[2] On December 12, 2008, one month after his arrest, while out on bail, Symonevich made two calls on TT-6 to Ariel-Soto that were intercepted. In the first, he again identified himself as "Dale's man from Maine" and asked if he could "swing by and see you today." No further details were overheard.

-6-

insufficient evidence to show that he joined the charged Duran Gomez conspiracy to distribute drugs; and (4) the district court failed to properly instruct the jury that intent to resell drugs is not necessarily sufficient to prove membership in a conspiracy to distribute drugs. We address each argument in turn.

## A. Motion to Suppress

Where the denial of a motion to suppress has been challenged, we review the district court's findings of fact for clear error, United States v. Werra, 638 F.3d 326, 330 (1st Cir. 2011), and "we review de novo the district court's conclusions of law, including its application of the law to the facts, its probable cause and reasonable suspicion determinations, and the district court's ultimate legal decision to grant or deny the motion to suppress," United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011).

After hearing argument on the standing issue, the district court orally denied Symonevich's motion to suppress, relying on Rakas v. Illinois, 439 U.S. 128 (1978):

> [I]f the drugs weren't taken on [Symonevich's] person but taken from the car, simply as a passenger, without more, without some kind of showing beyond the fact of being a passenger in a car and it having been found underneath his seat, that's not enough . . . so the motion will be denied for lack of standing.

Symonevich argues that as a passenger in the Subaru, he had a reasonable expectation of privacy in items seized therefrom

-7-

and, thus, had standing to challenge the lawfulness of a search.[3]
He argues that

> the law simply cannot be so fine as to allow
> an individual to challenge a pat frisk of his
> person, but not allow him to challenge the
> seizure of property he had placed just beneath
> his seat seconds before the encounter. . . .
> [W]hen Mr. Symonevich was placing the can
> beneath his seat, he expected it would remain
> as private as if he placed it in his pocket.

In addition, Symonevich argues that the district court failed to adequately consider the duration of the trip between Maine and Massachusetts in determining whether he had a legitimate expectation of privacy in the vehicle. He also claims that he had a possessory interest in the can of tire sealant that afforded him a reasonable expectation of privacy in the space under the seat and thus standing to suppress the recovered evidence.

The government makes three arguments in response: (1) that a passenger does not have standing to challenge the search of a lawfully stopped vehicle in which he or she has no proprietary interest; (2) in the alternative, that there was probable cause to believe contraband would be found in the Subaru, and hence the

---

[3] Because the parties both use the term "standing" in their briefing, we do so here. We note, however, that the Supreme Court has stated that the threshold analysis is "more properly placed within the purview of substantive Fourth Amendment law than within that of standing," United States v. Lipscomb, 539 F.3d 32, 36 (1st Cir. 2008) (quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998)) (internal quotation marks omitted). As a threshold matter in arguing for suppression, the defendant must establish that he or she had a reasonable expectation of privacy in the area searched or the items seized. Id. at 35-36.

search was lawful under the so-called "automobile exception" to the Fourth Amendment's warrant requirement; and (3) in the further alternative, that the recovered evidence would have inevitably been discovered by DEA agents if they had stopped the Subaru before Trooper Sweeney, as they were about to do, and hence it should be admitted pursuant to the inevitable discovery doctrine, see United States v. Pardue, 385 F.3d 101, 107-08 (1st Cir. 2004). We focus on the government's first argument.

The Fourth Amendment's protection against unreasonable searches may only be claimed where a defendant demonstrates that he or she personally has a reasonable expectation of privacy in the place searched. See Rakas, 439 U.S. at 143-44 n.12. As a general proposition, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his [or her] Fourth Amendment rights infringed." Id. at 134. In the context of a vehicle search, a passenger who has "asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized," has made no showing that he or she has a legitimate expectation of privacy in, for example, the area under the seat of the car in which he or she was "merely [a] passenger[]." Id. at 148. Under such circumstances, a vehicle search does not infringe upon the

passenger's Fourth Amendment rights. Thus, the passenger lacks standing to challenge the search.

Symonevich argues that the Supreme Court has recently recognized the Fourth Amendment rights of passengers in the context of vehicle stops. See Arizona v. Johnson, 555 U.S. 323, 332 (2009) (explaining that a passenger "is seized, just as the driver is, from the moment [a car stopped by the police comes] to a halt on the side of the road") (alteration in original) (quoting Brendlin v. California, 551 U.S. 249, 263 (2007)) (internal quotation marks omitted). These cases, however, do not extend Fourth Amendment rights to passengers who challenge only the search of the vehicle in which they were traveling and not their seizure. Indeed, the Brendlin Court noted that the appellant "did not assert that his Fourth Amendment rights were violated by the search of [the driver's] vehicle, but claimed only that the traffic stop was an unlawful seizure of his person." 551 U.S. at 253 (citation omitted). Moreover, the Court approvingly cited Rakas for its rejection of the "target theory" of standing, embraced by Symonevich here, which would effectively allow "any criminal defendant at whom a search was directed" to challenge the legality of the search. Id. at 260 (quoting Rakas, 439 U.S. at 132) (internal quotation marks omitted).

Symonevich argues that even if Brendlin and Johnson did not explicitly overrule Rakas, they did so implicitly because

concluding otherwise would defeat the deterrent purposes of the exclusionary rule.[4] We disagree. "[T]he exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, [and] it is [thus] proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." Rakas, 439 U.S. at 134. Indeed, "[d]espite the deterrent aim of the exclusionary rule, [the Supreme Court has] never held that unlawfully seized evidence is inadmissible in all proceedings or against all persons. 'The application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.'" Id. at 134 n.3 (alteration omitted) (citations omitted) (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). The Supreme Court has regularly declined to extend the benefits of the exclusionary rule to defendants whose personal Fourth Amendment rights have not been infringed upon, and we decline to do so here. See, e.g., Carter, 525 U.S. at 88.

---

[4] As a general proposition, an argument that the Supreme Court has implicitly overruled one of its earlier decisions is suspect. See Agostini v. Felton, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. . . . '[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'" (quoting Rodriquez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989))).

Symonevich argues in the alternative that the particular circumstances in this case gave him a reasonable expectation of privacy in the vehicle. Relying on our decision in United States v. Lochan, 674 F.2d 960, 963-65 (1st Cir. 1982), Symonevich argues that the duration of the trip between Maine and Massachusetts – a nearly six hour round-trip drive – was long enough that he had a reasonable expectation of privacy in the vehicle. We did say in Lochan that the fact of a long trip "would engender a slightly greater privacy expectation than would a short trip." Id. at 965. Symonevich says that vehicle passengers on long rides are akin to overnight guests and thus have a reasonable expectation of privacy in the vehicle. As he puts it, "[s]ociety would consider it reasonable to bring personal items along on such a lengthy car ride . . . and recognize that this long of a trip would give rise to some expectation of privacy on the part of a passenger within the vehicle."

We are skeptical about the continued relevance of the type of duration argument that Symonevich makes.[5] Since we decided Lochan, the Supreme Court has developed extensive case law on the

---

[5] We characterized the trip in Lochan as "long." Despite that fact - and the fact that the defendant had been driving the vehicle when it was stopped - we concluded that the defendant failed to demonstrate that he had a reasonable expectation of privacy in the vehicle. Other factors "far outweighed" the effect of the duration of the trip, including the fact that the appellant did not own the car. See Lochan, 674 F.2d at 965.

automobile exception, circumscribing the amount of privacy one can expect in a vehicle and further differentiating searches of automobiles from searches of homes. Compare, e.g., New York v. Class, 475 U.S. 106, 112-113 (1986) ("One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." (quoting Cardwell v. Lewis, 417 U.S. 583, 590 (1974) (plurality opinion) (internal quotation marks omitted)), and St. Hilaire v. City of Laconia, 71 F.3d 20, 28 n.6 (1st Cir. 1995) ("Fourth Amendment law . . . recognizes a distinction between a person's home and a person's car. For example, the Fourth Amendment permits a slightly broader search pursuant to the arrest of the occupant of a vehicle and some warrantless searches of vehicles are permitted even if there are not emergency circumstances."), with Carter, 525 U.S. at 99 (Kennedy, J., concurring) ("The Fourth Amendment protects '[t]he right of the people to be secure in their . . . houses,' and it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." (alteration in original) (quoting U.S. Const. amend. IV)). Thus, any analogy between an automobile and a house is suspect. In any event, without categorically rejecting the relevance of the duration of a

trip in an automobile to the reasonable expectation of privacy analysis, we conclude that the duration of the trip here, under all of the circumstances, did nothing to enhance Symonevich's expectation of privacy.

Symonevich also argues that he had a possessory interest in the can of fix-a-flat, and that this possessory interest established his reasonable expectation of privacy in the space under the passenger seat. Although Symonevich acknowledges that he never explicitly claimed a possessory interest in the can, he says that the government imputed such possession to him when it charged him with criminal conspiracy to distribute narcotics based on the heroin found in the can. He now argues that he was entitled to the same presumption for purposes of his constitutional challenge to the search. The government contends that Symonevich insufficiently asserted his possessory interest in the can, arguing that he did not submit an affidavit claiming that interest with his motion to suppress.[6]

We need not resolve that dispute because even if Symonevich had demonstrated a possessory interest in the can, that

---

[6] The burden to establish a reasonable expectation of privacy lies squarely on the movant. See, e.g., Lipscomb, 539 F.3d at 35-36. Symonevich suggests that he was unable to make his standing argument for fear of self-incrimination. That argument is meritless, as we have long held that "testimony given to meet standing requirements cannot be used as direct evidence against the defendant at trial on the question of guilt or innocence." Id. at 36 n.1 (quoting United States v. García-Rosa, 876 F.2d 209, 219 (1st Cir. 1989)) (internal quotation marks omitted).

-14-

interest would not establish a reasonable expectation of privacy in the space beneath the passenger seat. Whether or not Symonevich had a possessory interest in the can, he placed the can under the seat, an area in which he had no reasonable expectation of privacy. See Rawlings v. Kentucky, 448 U.S. 98, 105-106 (1980) (citing Rakas, 439 U.S. at 149-50 n.17). As the Rawlings Court noted, "[h]ad [the] petitioner placed his drugs in plain view, he would still have owned them, but he could not claim any legitimate expectation of privacy." Id. at 106. Here, too, the petitioner may have owned the can of tire sealant that contained the drugs. As a passenger in the vehicle, however, he lacked a reasonable expectation of privacy in the space beneath the car seat for the reasons already discussed. Symonevich's alleged possessory interest does not strengthen his expectation of privacy argument.

In summary, we agree with the district court that, as a passenger in the Subaru, Symonevich did not have a reasonable expectation of privacy in the space below the passenger seat from which the heroin was recovered. We affirm the district court's denial of his motion to suppress on that basis.

## B. Evidentiary Challenges

Symonevich argues that the district court erred by admitting two types of evidence at trial: Special Agent Murray Archambault's opinion testimony that Symonevich was a distributor, and summary charts of intercepted phone calls and information

conveyed therein.[7]   We review a district court's evidentiary determinations, including its decision to admit certain testimony, for abuse of discretion.  United States v. Rodríguez-Vélez, 597 F.3d 32, 40 (1st Cir. 2010).

### 1. Special Agent Archambault's "Distributor" Testimony

During a pre-trial colloquy, the government stated that it "was content to proceed without expert testimony per se," and the court noted that the government had noticed no experts. Nevertheless, Symonevich argues that the government presented, and the district court admitted, expert testimony from Archambault, who stated a number of times that in his opinion, based on the quantity of drugs Symonevich purchased, Symonevich was a drug distributor, not a mere consumer.  Symonevich alleges that the admission of that expert testimony was an abuse of discretion.  See United States v. Valdivia, 680 F.3d 33, 58-61 (1st Cir. 2012) (Lipez, J., concurring).

We bypass that issue.  Even assuming that it was an abuse of discretion, the error was harmless given the abundance of additional evidence, discussed below, that supported the jury's

---

[7] Ordinarily we would discuss a challenge to the sufficiency of the evidence, which might result in a judgment of acquittal, before alleged trial errors, which might result only in the lesser relief of a new trial.  But, given the trial errors cited by the appellant, we must first examine them to determine the scope of the record for the purpose of the sufficiency analysis.

conclusion that Symonevich participated in the charged conspiracy to distribute drugs.[8]

## 2. Charts Summarizing Data from Intercepted Calls

Government witness Kristina O'Connell, an Internal Revenue Service agent, testified about the data that she collected from the more than 10,000 intercepted calls. The 71-page spreadsheet containing the call data was admitted into evidence. Of the 1,024 deals arranged during those calls by 127 different individuals, O'Connell testified that Symonevich made the second largest individual purchase of heroin. To summarize information contained in the extensive data spreadsheets, the government presented a chart showing the average amount of heroin purchased by each of the 127 individuals ("Exhibit 27"), and a chart showing how Symonevich's individual purchases compared to the average purchase arranged during intercepted calls ("Exhibit 14").

In arguing that the district court abused its discretion by admitting these charts, Symonevich claims that information about the size of his purchases compared to other individuals' purchases was "utterly immaterial to the issues in the case" and was used only to buttress Archambault's testimony. He further argues that the charts' probative value was substantially outweighed by the danger of unfair prejudice: "Here the danger was one of unfair subtle persuasion. . . . The charts create a subtle bias. The

---

[8] See infra note 9.

working assumption is that a large buyer must have been a distributor." See Fed. R. Evid. 403.

Rule 403 states that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Evidence, however, is not unfairly prejudicial merely because it is harmful to the defendant. Indeed, if the evidence did not prejudice Symonevich in some way, it would not be relevant to the case. For purposes of Rule 403, "unfair prejudice" occurs where there is "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's note.

"Only rarely – and in extraordinarily compelling circumstances – will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Fitzgerald v. Expressway Sewerage Constr., Inc., 177 F.3d 71, 75 (1st Cir. 1999) (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1998)) (internal quotation marks omitted). The circumstances here are not compelling. The relevance and probative value of evidence demonstrating the size of Symonevich's purchases relative to Ariel-Soto's other customers' purchases are apparent. The evidence may have appropriately informed the jurors'

-18-

understanding of the nature of the relationship between Symonevich and Ariel-Soto and whether the drugs were intended for personal consumption or redistribution, both critical components of the government's conspiracy case. The district court did not abuse its discretion in determining that the probative value of this testimony was not substantially outweighed by a danger of unfair prejudice.

## C. Sufficiency of the Evidence

Having determined the scope of the record for the purpose of the sufficiency analysis, we now consider whether there was sufficient evidence to prove that Symonevich joined the charged conspiracy to distribute and to possess with intent to distribute narcotics. We review a challenge to the sufficiency of the evidence de novo, considering both direct and circumstantial evidence in the light most favorable to the verdict. Rodríguez-Vélez, 597 F.3d at 38. A reversal is warranted only where no rational factfinder could have concluded that the evidence presented at trial, together with all reasonable inferences, established each element of the crime beyond a reasonable doubt. Id. at 39.

To prove a conspiracy to distribute narcotics, the government must show that a conspiracy existed, the defendant knew of the conspiracy, and the defendant voluntarily participated in it. Id. Symonevich purchased 110 grams of heroin in a ten-day

period for approximately $12,000. His 50-gram purchase on November 6 was the second largest individual sale of heroin of the more than one thousand deals recorded on the wiretap. The average size of Symonevich's purchase across three purchases was 36.6 grams of heroin. The average for all the deals recorded between August 2008 and January 2009 was 5.2 grams.

Each of the deals that Symonevich arranged with Ariel-Soto followed a familiar pattern and was arranged quickly. Ariel-Soto would direct Symonevich where to meet with a courier. Symonevich then traveled from Maine to purchase drugs in Massachusetts within hours of calling Ariel-Soto. Other evidence showed that Symonevich made orders using the conspiracy's code, understood the structure of the organization, and cooperated with Ariel-Soto to avoid police detection.

The jury could have inferred from this evidence that Ariel-Soto and Symonevich shared more than a buyer-seller relationship involving personal use or redistribution of the drugs by Symonevich independent of the Duran Gomez organization. Further, from Symonevich's willingness to contact Ariel-Soto a month after Symonevich's arrest, the jury could have concluded that the two had a relationship based on trust and familiarity. Moreover, from the fact that Symonevich always introduced himself as "Dale's man from Maine," the jury could have inferred that

Symonevich and Ariel-Soto were connected by a third party known to Ariel-Soto as part of the redistribution network.

While we have stated that proof of redistribution may not necessarily prove a conspiracy, it may be sufficient in some circumstances:

> The use of conspiracy doctrine in a vertical context has caused courts unease. In this circuit the continuing purchase and sale relationship between [the dealers and the defendant], and the dealers' knowledge of [the defendant's] re-distribution, would permit a jury to infer both an agreement between them that [the defendant] possess the drugs and the requisite intent as to distribution.

United States v. Boidi, 568 F.3d 24, 29-30 (1st Cir. 2009). The foregoing evidence, together with all reasonable inferences, was sufficient for a rational jury to conclude that each element of the conspiracy to distribute (its existence, Symonevich's knowledge of it, and his voluntary participation in it) had been proven beyond a reasonable doubt.[9]

---

[9] We declined earlier to decide whether Archambault's testimony that Symonevich was a distributor was impermissible expert testimony, stating that even if its admission was erroneous, that error was harmless. Consistent with that determination, we have evaluated the sufficiency of the evidence here without considering the challenged portions of Archambault's testimony. Although Archambault referred to Symonevich as a distributor a number of times and explained that that characterization was based on the amount of drugs that Symonevich purchased, these references occurred as part of a larger colloquy about the structure of the drug trafficking organization, the use of couriers, and the average amount of drugs purchased by customers on the tapped phone line. Moreover, while the government argued in closing that Symonevich was a distributor given the quantity of drugs that he purchased, it made no direct references to Archambault's opinion testimony.

**D. Jury Instruction**

We review preserved claims of instructional error "under a two-tiered standard: we consider de novo whether 'an instruction embodied an error of law,' but 'we review for abuse of discretion "whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues."'" United States v. Jadlowe, 628 F.3d 1, 14 (1st Cir. 2010) (quoting United States v. Silva, 554 F.3d 13, 21 (1st Cir. 2009) (quoting United States v. Ranney, 298 F.3d 74, 79 (1st Cir. 2002))). The district court's refusal to give a particular instruction constitutes error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case. United States v. Mercado, 412 F.3d 243, 251 (1st Cir. 2005). An error mandates reversal only when it is prejudicial based on a review of the entire record. United States v. Díaz, 670 F.3d 332, 341 (1st Cir. 2012).

Here, Symonevich argues that the district court erred when it failed to give an instruction stating that "evidence that a buyer intends to resell the product does not necessarily

Given the extensive evidence implicating Symonevich in the charged conspiracy, including the multitude of data demonstrating that Symonevich made larger individual purchases than most other customers, we conclude that any error in admitting Archambault's distributor testimony was harmless.

establish that he has joined a distribution conspiracy."[10]  He alleges that the instruction given "could have led jurors to infer that they could convict of conspiracy if Mr. Symonevich had any plans to distribute the drugs when he bought them, and that such intent would satisfy the element of shared intent, regardless of the intent of the seller, even if [the] defendant did not fully join the conspiracy."

We disagree.  In relevant part, the district court's instructions stated:

> In order to prove the crime of conspiracy the government must prove two things.  First, that two or more persons entered into an unlawful agreement as alleged in the indictment, that is, there was a conspiracy; and second, that the defendant in question knowingly and willfully became a participant in that conspiracy.
>
> . . . . It's not enough to show that people behave similarly or that they were associated in some way with each other, that they knew each other, or even that they engaged in certain transactions with each other.  Proof that certain persons associated does not by itself show they had agreed to act together to commit an unlawful act or pursue an unlawful purpose, although, of course, the association

---

[10] Symonevich's jury instruction argument here is more refined than the instruction he proposed below.  He is correct, as he argues on appeal, that evidence that a buyer intends to resell drugs does not <u>necessarily</u> establish a conspiracy to distribute. Although he states that the instruction he proposed in the district court was "to this effect," in truth, his proposed instruction was a misstatement of the law.  It stated, in pertinent part, that "evidence that a buyer intended to resell drugs instead of personally consuming them <u>does not</u> establish a conspiracy." (Emphasis added.)

is a fact you can take into account, among others, in deciding whether they had, in fact, an agreement.

Now, in particular, the existence of a simple buyer/seller relationship does not by itself establish that a conspiracy existed between the buyer and the seller. There must be evidence, direct or circumstantial, that the participants shared a joint purpose that was the object of the alleged conspiracy. So, for example, if in your judgment, the evidence supports a conclusion that the buyer and the seller shared the joint purpose of distributing illegal drugs, then the existence of a conspiracy between them to do so might be inferred. But the evidence must show that the members of an alleged conspiracy or participants in an alleged conspiracy in some way or manner came to an actual mutual understanding or agreement that they would jointly try to accomplish the conspiratorial objective.

Symonevich's proposed instruction was substantially incorporated into the instructions given. The district court told the jury that in order to be convicted, Symonevich had to "bec[o]me a participant in that conspiracy" (emphasis added), an unmistakable reference to the conspiracy to distribute drugs alleged in the indictment. Moreover, the district court explained that similar behavior between individuals is not sufficient to demonstrate a conspiracy. The court explained that just because Ariel-Soto and Symonevich allegedly both intended to distribute drugs does not prove that they were in a conspiracy or working toward a shared goal. The court made this point explicit when it said that a conspiracy requires "a joint purpose" regarding which "the members

of [the] alleged conspiracy in some way or manner came to an actual mutual understanding or agreement that they would jointly try to accomplish the conspiratorial objective." Summarizing the instruction, the district court stated that "the crime of conspiracy requires the government to prove beyond a reasonable doubt the existence of a conspiracy with the objective as alleged in the indictment, and that the defendant knowingly and intentionally joined in that conspiracy intending to help bring about its objective. If the government fails to prove either of those things beyond a reasonable doubt, then the government will not have proved the offense as charged . . . ." This was an accurate statement of the law.

In contrast, Symonevich's proposed instruction failed to capture the nuances articulated in Boidi and discussed in Part II.C, namely, that while proof of redistribution may not necessarily prove a conspiracy to distribute, it may be sufficient in some circumstances. 568 F.3d at 29-30 (holding that a continuing purchase and sale relationship in combination with the dealers' knowledge of the defendant's redistribution permits a jury to infer an agreement between the dealers and defendant that the defendant possess and distribute the drugs to advance a common conspiratorial goal). The proposed instruction was a misstatement of the law and could have misled the jury into believing - as Symonevich unconvincingly argues on appeal - that evidence of

Symonevich's intent to resell was irrelevant.  The instruction given was accurate and adequate.  The district court did not abuse its discretion by wording the instruction as it did.

Affirmed.