# United States Court of Appeals
## For the First Circuit

No. 13-1251

UNITED STATES OF AMERICA,

Appellee,

v.

FOSTER L. STARKS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch, Chief Judge,
Thompson and Kayatta, Circuit Judges.

James L. Sultan, with whom Kerry A. Haberlin was on brief, for
appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

October 8, 2014

THOMPSON, Circuit Judge. Foster Starks, Jr. was not having a good day. First, he learned that his son had been arrested, then he was tasked with the unenviable job of retrieving a rental car from the son's irate girlfriend. Lastly, as he was nearing home that night, he saw a State Trooper's blue lights reflected in the rental's rearview mirror. So one could say that the cherry on the cake of Starks's day was the Trooper's discovery of the bag on the seat beside him--containing, as it did, a gun and two boxes of ammunition. Starks was charged with being a felon in possession of a firearm, and when his luck did not improve at trial, he was convicted and sentenced to 210 months in prison. He raises a number of issues on appeal, including one that is determinative. Because the district court erred in holding that Starks, as the unauthorized driver of the rental car, did not have standing to challenge the stop, we reverse his conviction and remand for an evidentiary hearing.

## I.

### BACKGROUND

### A. The Stop

On the night of May 24, 2009, Starks was driving north on Route 24 in a black Kia Sportage. Massachusetts State Trooper Jason Vital was on patrol that evening when he saw Starks signal and pull into the breakdown lane. Vital stopped to offer assistance, and as he approached the Kia, Starks stepped out of the

car. Noticing that Starks looked "tense, jittery, nervous," Vital asked if he was alright, and Starks replied that he had dropped his cigarette. Starks then reached down to the floor on the driver's side and produced the lit cigarette. Satisfied that his assistance was not needed, Vital returned to his cruiser and watched as Starks resumed his journey.

Starks was not, however, home free. According to Vital, he followed behind Starks and noticed that the Kia was traveling at approximately forty to forty-five miles per hour in a sixty-five mile per hour zone. After observing the Kia drifting and crossing the lane lines, Vital conducted a registry check and determined that the car was registered to a rental company, but that the registration listed the car's color as red, rather than the black that it was. Vital continued to follow Starks for a short time, and after noticing two more lane violations, he activated his lights and pulled over the Kia.

Starks provided his license and registration to Vital, and during their discussion about the color discrepancy, Starks said, "[H]ey, it's a rental."[1] Vital returned to his cruiser to conduct a license and warrants check, and discovered that Starks's license had been suspended as a result of an unpaid seatbelt violation. At the same time, Vital learned that Starks had "a

---

[1] As will be discussed infra, the car had been rented by Starks's friend, Wendy Ford. Starks was not an authorized driver on the rental agreement.

fairly lengthy criminal history," and had completed a sentence for armed robbery. Vital returned to the Kia and placed Starks under arrest for driving on a suspended license.

In conducting a pat-down frisk, Vital felt a pill bottle in Starks's pocket. He removed the bottle, which Starks said contained blood pressure medication, and opened it to find that it held "approximately nine types of different pills."

### B. The Search

Vital handcuffed Starks and placed him in the back of his cruiser. Vital then returned to the Kia and shone his flashlight through the passenger-side front window. He spotted a white plastic shopping bag on the front seat. The bag was translucent enough that Vital could see through it to glimpse a white box with the word "Independence" printed on it in black. Vital recognized the label as a brand of ammunition.

Vital opened the car door and began looking through the contents of the bag. It contained two boxes of ammunition (.357 caliber and .38 caliber) and two smaller plastic bags. One bag contained a .45 caliber handgun wrapped in a bandanna, as well as a magazine with seven .45 caliber rounds, and a baggie with an additional seven rounds. The other bag contained four prescription medication bottles, all of which were labeled Foster L. Starks and

each of which contained only the medication listed on the label.[2] The bags also contained other items, including clothing and "court paperwork."

After discovering the gun and the prescription bottles, Vital opened the center console of the Kia and found a cache of "approximately 227 round tablets" that appeared to be OxyContin; the pills were later determined to be counterfeit. The pills may have been fake, but Starks was in real trouble. He was indicted by a grand jury for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).

## C. The Motion to Suppress

Starks's defense strategy was two-pronged; he intended to challenge the legality of the stop, and he intended to show that he had no knowledge of the contents of the bag, because it had been packed by his son Dante's erstwhile girlfriend, Teanisha Rodriguez. Prior to trial, Starks moved, pursuant to the Fourth and Fourteenth Amendments, to suppress "all evidence obtained as a result of the illegal stop." In his memo in support of the motion, Starks argued that the stop was pre-textual, that he was neither swerving nor driving too slowly, and that Vital stopped him because he is African-American. Specifically, Starks argued that "a seizure occurred when Trooper Vital stopped the car" and that because the

---

[2] Pharmacy records indicate that these medications were dispensed to Starks.

stop was not justified, the "fruits" of the stop should be suppressed. In support of this argument, Starks submitted an affidavit from Professor of Economics Dr. Steven Durlauf, who examined statistics from the Massachusetts State Police and determined that the percentage of African-Americans stopped by Vital was 38.6% higher than the percentage stopped by other troopers.

A hearing on the motion to suppress was held on May 26, 2011. At the outset of the hearing, before either Vital or Durlauf testified, the government stated that Starks "had absolutely no standing to even challenge the search of the vehicle . . . because he was an unlicensed driver but it was a rental car so he was also an unauthorized driver. . . . We think he lacks standing." The district court gave Starks's counsel the choice of addressing standing immediately, or proceeding with witness examination. Because Durlauf had come in from Wisconsin, counsel chose to proceed before addressing standing. Following the two witnesses, the hearing was continued to July 27.

On the second day of the hearing, the district court instructed Starks's counsel that "what I was waiting for you to do is to get to somebody who is going to testify that he either has a driver's license, you know, that the woman gave him permission to use the car or she didn't give him permission." Starks's friend, Wendy Ford, then testified that she gave her license and credit

card information to the rental company to allow Rodriguez to rent the car. She further testified that when Starks called her on Sunday afternoon, May 24, 2009, she did not realize that Rodriguez had extended the rental and still had the car. During that conversation, she and Starks agreed that he would retrieve the car from Rodriguez and return it on Tuesday.[3] Ford testified that she gave Starks her express permission to drive the car.

The government then called a rental company employee, Richard Pozner, who testified that Ford could not authorize anyone other than a domestic partner to drive the car.

At the conclusion of testimony, the government argued that Starks had no standing to challenge the stop because, as an unauthorized, unlicensed driver, he had no reasonable expectation of privacy in the contents of the vehicle. Defense counsel argued that Starks had standing under the Fourth Amendment, because Ford had given him permission to drive the car and thus his expectation of privacy was reasonable. In the alternative, counsel argued that standing was established under the Equal Protection Clause of the Fourteenth Amendment, saying:

> I guess I would like to jump, Your Honor, to the second issue of standing in this case which is under the defendant's equal protection argument. We are not arguing that this is a straight Fourth Amendment illegal stop by an officer based on failure to have some kind of probable cause or reasonable

---

[3] Memorial Day fell on that Monday, May 30, 2009.

suspicion.  We're arguing that this officer himself discriminated against my client because of his race, because of his color, and he stopped the car based on racial profiling.

The district court denied the motion to suppress in a brief statement, saying "I don't think there's any standing here, to use that phrase, but certainly no expectation of privacy.  He was unlicensed and he was unauthorized and so he has no occasion to be here challenging the admission of evidence.  I am going to deny the motion . . . to suppress."  The district court made no other findings of fact.

## D. Motions in limine

As the case proceeded toward trial, the parties made a number of motions in limine.  The government moved to bar the testimony of Durlauf, the economics professor, arguing that Starks was "improperly attempting to re-litigate the motion to suppress in front of the jury."  When the court allowed the motion, Starks moved for reconsideration, arguing during a pre-trial conference that Durlauf's testimony was admissible to impeach Trooper Vital. The district court denied the motion without further findings or comment.  The court also barred the testimony of the defendant's DNA expert, Dr. Carll Ladd, as irrelevant.

The next flurry of motions centered on Rodriguez.  She had previously given a statement to federal agents, and testified before the grand jury.  On both occasions, she denied being at home when Starks came to her apartment, and stated that the firearm did

-8-

not belong to either Dante or herself. Two years later, she spoke with a defense investigator and admitted to putting the gun and the ammunition into the shopping bag along with Dante's belongings, and said that she did so without Starks's knowledge.

Defense counsel made a motion in limine to "alert the [c]ourt that the proposed government witness T[e]anisha Rodriguez has significant Fifth Amendment rights" and would likely invoke those rights to avoid testifying. As a pre-emptive strike, the defense moved for the admission of Rodriguez's statement to its investigator, as well as several other pieces of evidence which, if admitted, would tend to support Starks's third-party culprit defense. Specifically, Starks sought to admit Rodriguez's grand jury testimony, her statements to federal agents, and her statements to the defense investigator. Defense counsel also sought the admission of Rodriguez's medical records, criminal history, the cases pending against her at the time of her grand jury testimony, as well as records of the Department of Children and Families.

The government opposed the motions, arguing that Rodriguez's statements were not admissible because the defense failed "to offer any corroborating circumstances clearly indicating the trustworthiness" of the recitations. See United States v. Monserrate-Valentín, 729 F. 3d 31, 52 (1st Cir. 2013) (defining the requirement of "meaningful corroboration" as "evidence that clearly

indicates that the statements were worthy of belief, based upon the circumstances in which the statements were made") (internal quotations omitted).  The government also argued that her medical records were not relevant.  On the first day of trial, the court adopted the reasoning of the government's response and denied the motion.  On the third day of trial, the defense called Rodriguez as a witness, and she invoked her privilege against self-incrimination.  Once she was unavailable as a witness, the defense made another motion in limine to admit Rodriguez's earlier statements, and again, the court denied the motion.

## E. Trial

A jury trial commenced on October 11, 2011.  During defense counsel's cross-examination of Trooper Vital, she approached the bench to seek guidance in pursuing a line of questioning about racial profiling.  At sidebar, defense counsel referenced the court's ruling on the motion to bar Durlauf's testimony, stating, "[d]uring this time of my cross-examination, I would ask him questions related to his knowledge of the race of the drivers that he had stopped and issues relating to racial profiling.  It's my understanding from the [c]ourt's order that you are precluding me from asking questions on this topic?"  When the court replied "Yes," counsel asked that a chart describing the statistics of Vital's stops relative to his fellow troopers be

admitted for identification, to preserve it for the appellate record.

During the government's closing, the prosecutor urged the jury to "not even consider . . . the propriety or the legality or the constitutionality" of the stop, saying "The stop was legal. The arrest was legal. The search was legal. That's a done deal. That's been decided by the judge." Defense counsel objected to the prosecution's comment, noting that the judge had ruled only that Starks had no standing to contest the legality of the stop, and had made no determination that the stop was legal. When the district court asked what she wanted to do about it, she declined a jury instruction, saying "I can't think of an instruction that would not draw more attention to the issue that would be helpful."

The jury returned a guilty verdict. Eight days later, defense counsel received information that a juror was acquainted with one of Starks's sons, and had not disclosed that information to the court. Starks moved for a new trial, arguing that the prosecutor's closing remarks were improper, and that a juror committed perjury during voir dire. The district court conducted evidentiary hearings before issuing a written order denying the motion in its entirety. On February 13, 2013, Starks was sentenced to 210 months in prison, and two years of supervised release. This timely appeal followed.

## II.

### DISCUSSION

Starks makes four main points on appeal. He argues that:
1) the district court erred in ruling that he lacked standing to
challenge the constitutionality of the initial stop; 2) the
prosecutorial misconduct during closing argument deprived him of a
fair trial; 3) the district court committed two evidentiary errors
by curtailing impeachment of Trooper Vital during cross-
examination, and by improperly excluding evidence of Rodriguez's
statements and background; and finally, 4) a juror's failure to
disclose information during voir dire violated his right to trial
by an impartial jury.

### A. Fourth Amendment Standing to Challenge Stop

Starks's first argument, the standing issue, is
dispositive. Although there were other missteps during the course
of this case, it was the stumble at this first hurdle that requires
us to vacate the conviction and remand for a new hearing. We will
therefore focus on the question of standing.

We review de novo the district court's ruling that Starks
lacked standing to bring a Fourth Amendment claim. See United
States v. Werra, 638 F.3d 326, 335 n.13 (1st Cir. 2011).

The government argues that Starks abandoned his Fourth
Amendment argument before the district court and thus the argument

has been waived and our review should be limited to plain error.[4]

The government contends that, during the hearing on the motion to suppress, defense counsel shifted focus to its second argument that the stop was racially motivated, thus leading the court to understand "that [Starks] was not pursuing the argument that Vital lacked reasonable suspicion." In support of this argument, the government quotes part of defense counsel's argument at the hearing: "I am not arguing that this is a straight Fourth Amendment illegal stop by an officer based on failure to have some kind of probable cause or reasonable suspicion." However, the government has ripped this quote from its moorings.

The hearing was preceded by defense counsel's submission of a comprehensive memorandum in support of the motion which thoroughly addressed both the Fourth and Fourteenth Amendment bases. In the memorandum, defense counsel led off with the argument that Starks had standing to challenge the illegal seizure, and then proceeded to contend that the stop which led to the seizure was not justified. In the final pages of her memorandum, she addressed the second argument--the Equal Protection issue. During the hearing, defense counsel again led off with the argument that Starks had standing under the Fourth Amendment, and after

_____

[4] "Arguments related to the unlawfulness of a search that were not raised to the district court, however, are considered waived or forfeited and are reviewed at most for plain error." United States v. Reynolds, 646 F.3d 63, 73 (1st Cir. 2011).

-13-

discussing cases from other circuits, she said, "I guess I would like to jump, Your Honor, to the second issue of standing in this case which is under the defendant's equal protection argument." That sentence makes clear that defense counsel was merely switching gears from her first argument to her second argument; at no time did she concede her Fourth Amendment argument. Accordingly, our review of the district court's ultimate legal decision to deny the motion to suppress is de novo.

Having addressed the waiver argument, the standing issue is easily resolved. In his memorandum in support of the motion to suppress, Starks argued that "a seizure occurred when Trooper Vital stopped the car," and that because the stop was not justified, its "fruits" should be suppressed. "When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment." Brendlin v. California, 551 U.S. 249, 251 (2007). In Brendlin, the Supreme Court determined that a passenger traveling in a car is seized along with the driver, and therefore has standing to challenge the constitutionality of the stop. Id. In its brief, the government concedes that a holding that an unauthorized driver cannot contest a stop "would be difficult to square with Brendlin." We concur. Even accepting the district court's finding that Starks was an unlicensed, unauthorized driver, his status was still no less than that of a passenger. Under Brendlin, Starks was seized within the meaning of the Fourth

-14-

Amendment, and thus has standing to challenge the constitutionality of the stop.[5]  In ruling, the court relied on the prosecution, which should have known its position was error.  The decision of the district court was incorrect as a matter of law.

The government concedes that if "the plain error standard does not apply or has been met, a remand is appropriate for the district court to address Starks's standing to contest the stop, and, if standing is found, whether Vital had reasonable suspicion." We agree.  Because the district court erred as a matter of law, we remand for a new hearing on Starks's motion to suppress.[6]

## B. Additional Concerns

Because we are vacating his conviction on other grounds, we need not address Starks's remaining arguments.  We would like, however, for the sake of thoroughness, to make a few brief points.

_____

[5] In so holding, we distinguish this case from our decision in United States v. Symonevich, 688 F.3d 12 (1st Cir. 2012).  In Symonevich, we held that a passenger did not have standing to challenge the lawfulness of a search; here, Starks is not challenging the search, but rather, the stop that preceeded it. Id. at 19-20.

[6] We note that the district court did not address Starks's alternative Equal Protection Clause argument.  The Supreme Court, in Whren v. United States, stated that "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment."  517 U.S. 806, 813 (1996).  Although other circuits have held that an Equal Protection violation does not require suppression of otherwise legally obtained evidence, see United States v. Nichols, 512 F.3d 789, 794 (6th Cir. 2008)(overruled on other grounds), we have not yet opined on this issue.  Starks contends that it is not necessary for us to do so at this time, and we agree.

First, the prosecutor's representation to the jury that the judge had determined the stop was legal was not only inappropriate, it was legally incorrect. The district court never reached the merits of whether the stop was legal; it merely determined (erroneously) that Starks lacked standing to make the argument that the stop was illegal. Starks also argued that the court erred in excluding evidence of Rodriguez's statements and background; we review such rulings for abuse of discretion. United States v. Powers, 702 F.3d 1, 10 (1st Cir. 2012). The court did not abuse its discretion when it found that her statements to the defense investigator lacked meaningful corroboration, and her grand jury testimony was inadmissible because the government did not have a similar motive to develop her testimony there. See United States v. Bartelho, 129 F.3d 663, 671 (1st Cir. 1997) ("[W]e focus narrowly on a party's motive and opportunity to develop particular testimony on a particular issue," and the government's motive may vary from case to case.). Finally, because this case will be remanded, we need not reach the question of juror bias.

## III.

### CONCLUSION

The district court's denial of Starks's standing was a fundamental error that requires us to vacate the conviction and remand for an evidentiary hearing in accordance with this opinion.